The plaintiff has failed to show that the goods were necessaries, and it appears that there were no previous dealings between the parties, in which the defendant had held out his wife as his agent, and in fact credit was apparently originally given to the wife, and not to the husband, upon the plaintiff's books. The complaint was therefore properly dismissed, unless. it appears that the plaintiff has made a prima facie case of actual, as distinguished from implied or apparent, agency. The plaintiff has shown that the goods were delivered and the work done in an apartment where the defendant lived, and of which he was in control, and that they were intended for use in that apartment, and therefore probably for the defendant's use. He has enjoyed the result of the contract made by his wife, and has admitted that he gave money to his wife, not to obtain these articles and decorations, but to pay the bill for them. If the alleged agent had been his housekeeper, and not his wife, I think that it would be evident that he would be liable for the bill incurred under these circumstances. If the defendant actually authorized his wife to contract with the plaintiff, the marital relation with his agent can certainly be no defense. The question of the actual authority should therefore have been submitted to the jury.

The judgment should be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur.

---

(134 App. Div. 475.)

GOLDSCHMIDT et al. v. MUTUAL LIFE INS. CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department. November 12, 1909.)

1. APPEAL AND ERROR (§ 1195*)—LAW OF THE CASE.

The decision of the court on appeal is the law of the case on a subsequent trial.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4661–4665; Dec. Dig. § 1195.*]

2. EVIDENCE (§ 122*)—RES GESTÆ—LIFE INSURANCE—SUICIDE.

In an action on a life policy, defended on the ground of suicide, the facts showing the financial, mental, and physical condition of insured immediately prior to the time of his death are relevant, as a part of the res gestæ.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 339–350; Dec. Dig. § 122.*]

3. WITNESSES (§ 171*)—COMPETENCY—TRANSACTIONS WITH DECEASED PERSONS.

The testimony of plaintiff, suing as assignee of a life policy, void if insured committed suicide, that he had had an appointment with insured, who said that he was in trouble, that plaintiff thereafter met insured, who laid before him his financial situation, and that plaintiff told insured that the only thing he could do was to make a settlement with his creditors, that plaintiff was willing to assist him, and that an appointment was made to meet insured in his place of business, to take up the stock, and see what he could offer his creditors, was testimony against plaintiff, and not objectionable, under Code Civ. Proc. § 829, prohibiting a party from testifying as to a transaction with a decedent.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 707; Dec. Dig. § 171.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

4. INSURANCE (§ 659*)—LIFE INSURANCE—SUICIDE OF INSURED—EVIDENCE.

    Where, in an action on a life policy, void if insured committed suicide, there was evidence tending to show suicide by poison, evidence of the financial troubles of insured was admissible, as bearing on a motive to commit suicide.

    [Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1692; Dec. Dig. § 659.*]

Appeal from Trial Term, New York County.

Action by Adolph Goldschmidt and others against the Mutual Life Insurance Company of New York. From a judgment for plaintiffs, and from an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, CLARKE, and HOUGHTON, JJ.

James McKeen, for appellant.

Wilson & Wallis (William G. Wilson, of counsel), for respondents.

CLARKE, J. This was an action, brought on the 28th of May, 1877, by the plaintiffs, as assignees of two policies of insurance issued by the defendant upon the life of one Oscar Edler, who died on the 27th of August, 1876. The first policy provided by its terms that it should be null and void if the insured should die by his own act or hand, whether sane or insane, and that in such case the company would return the premiums paid. The second policy provided that the self-destruction of the person, whether voluntary or involuntary, and whether he be sane or insane at the time, was not a risk assumed by the company in this contract; but in every such case the company would, upon demand, pay the net reserve upon it held by the company at the beginning of the year in which the death occurred, calculated by the present legal standard of the state of New York. The defense interposed was that the defendant did commit suicide, and defendant offered to pay under the first policy the amount of the premiums paid thereon, and under the second the legal reserve provided therein.

Upon the first trial, at the close of the plaintiffs' case, a verdict was directed for the plaintiffs for the sum so admitted by defendant to be due. This was reversed (102 N. Y. 486, 7 N. E. 408), upon the grounds of the improper admission in evidence of the record of the coroner's inquest, and that the burden of proof was upon the defendant to show that Edler had committed suicide, and not, as erroneously held at the trial, upon the plaintiffs of showing that he did not die by his own hand. Upon the second trial judgment was rendered in favor of the plaintiffs for the amount conceded to be due upon a verdict directed by the court. This judgment was reversed (58 Hun, 611, 12 N. Y. Supp. 866), upon the ground that the case should have been submitted to the jury. It is the law of the case, therefore, that the burden of establishing the defense, viz., that Edler did commit suicide, is upon the defendant, and that upon the testimony submitted this was a question of fact to be determined by the jury. Upon the third trial some new and additional evidence was introduced on behalf of the de-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

fendant; but the issue was still one of fact, requiring submission to the jury, and it was so submitted. The jury returned a verdict for the plaintiffs for the full amount claimed.

We do not consider whether that verdict was sustained by the weight of the evidence or not, because we find in the record that certain competent evidence was excluded; such exclusion constituting error which, in our opinion, is fatal to the maintenance of this judgment. Oscar Edler, the decedent, was 32 years of age at the time of his death, and unmarried. He was a retail dealer in gloves, etc., having a store on Broadway, in the city of New York, and occupying a small room in a lodging house on West Fifty-Second street.

Daniel Goldschmidt, one of the plaintiffs, testified that he was a member of the firm of Goldschmidt, Bachrach & Co. and that Mr. Edler was a debtor of his firm at the time these policies were taken out; that he held four other policies in two different companies on his life at the same time. There were three companies altogether, $5,000 in each. "Mr. Edler, at the time of making these two assignments of these two Mutual Life policies to my firm, owed by firm money. * * * His total indebtedness to my firm at the time of these assignments was in the neighborhood of $20,000. The insurance was taken out at the suggestion of myself, or a member of my firm. We wished to have some security for the indebtedness. * * * That was an indebtedness that was floating, and Mr. Edler received merchandise from us, and he never owed us less than that. I felt that I needed some security. I did not understand at that time that Mr. Edler was pressed for money to pay his bills."

The testimony of David Bachrach, one of the plaintiffs, given upon a former trial and since deceased, was read for the defendant. Mr. Bachrach testified:

"Oscar Edler in his lifetime was an intimate friend of mine; a warm friend. He died in 1876. * * * Our relations had been intimate with one another socially, and latterly in business, also, they were. I knew the condition of his affairs shortly before his death."

He was then asked:

"How did you learn it?"

This question was objected to, the objection was sustained, and the evidence excluded. The evidence so excluded was the following:

"We had an appointment with him that Thursday night, because he told us he was in trouble, and my partner and myself went on Thursday night by appointment to meet him at his store—1163 Broadway, I think. When we came there he laid his whole situation before us, and we told him there was nothing else left to him than to make a settlement with his creditors, and that we would be willing to help him make that settlement; and in order to know exactly what he had, and what he didn't have, we made an appointment with him to meet him on Sunday morning in the store to take up the stock and see what he could offer to his creditors. On Saturday afternoon I wrote him a note."

Then this evidence was admitted:

"Q. You stated that you had knowledge of Mr. Edler's affairs, did you not? A. Yes; I had access to his books. I used that access thoroughly to ascertain his condition at that time."

He then testified that on Sunday morning, which was the morning Edler was found dead, he went to Edler's house with his partner.

This excluded testimony tended to show that immediately prior to Edler's death he was in financial trouble; that the plaintiffs, who were creditors of his, and to whom he had assigned the policies of insurance in suit as security, upon his request made an examination of his books, and advised him that there was nothing else for him to do but to make a settlement; and that they had an appointment to meet him to further consult about the matter on the very morning upon which he died. The issue tendered being intentional suicide, the facts and circumstances which tended to show the financial, mental, and physical condition of the decedent immediately prior to the time of the death were relevant as part of the res gestæ.

The evidence was not objectionable under section 829 of the Code of Civil Procedure, for it was not evidence given by a witness in his own behalf or interest against the executor, administrator, or survivor of a deceased person, or a person deriving his title or interest from, through, or under a deceased person, by assignment or otherwise, but was given by one of the plaintiffs against himself. We find, therefore, no ground for its exclusion. An examination of the cases will show that evidence of the physical, mental, and financial condition of the decedent shortly prior to his death, when suicide is claimed, has been commonly received. In Mutual Life Ins. Co. v. Hillmon, 145 U. S. 285, 12 Sup. Ct. 909, 36 L. Ed. 706, it was said:

"A man's state of mind or feeling can only be manifested to others by countenance, attitude, or gesture, or by sounds or words, spoken or written. The nature of the fact to be proved is the same, and the evidence of its proper tokens is equally competent to prove it, whether expressed by aspect or conduct, by voice or pen. * * * Whenever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party."

In Ritter v. Mutual Life Ins. Co., 169 U. S. 139, 18 Sup. Ct. 300, 42 L. Ed. 693, the financial condition of the decedent, and his letters and declarations, oral and written, were admitted upon the issue of suicide.

"The testimony was competent and material, as tending to show the mental condition of Kerr, and what were his expectations and apprehensions, at and just preceding his death." Kerr v. Woodmen of America, 117 Fed. 593, 54 C. C. A. 655.

In Landon v. Preferred Accident Insurance Company, 43 App. Div. 487, 60 N. Y. Supp. 188, affirmed 167 N. Y. 577, 60 N. E. 1114, testimony as to a conversation between the deceased and a witness having been admitted, the court said:

"It is said that the declarations of the deceased * * * as to his intention to go to Staten Island were improperly received, and should have been excluded upon the objection which was made. We think otherwise. The declaration is a circumstance, the same as any other act would have been. It tended to explain and account for the presence of the body at the point where it was found, and to show that its being in that locality was consistent with a normal act. Its tendency was to show that the ensuing death was accidental in occurrence, as it authorized the inference that he acted upon a fixed purpose, in a natural way, and as his usual business called upon him to act. The rule

:as to declarations in the absence of a party has obviously no application to such a case."

In Pagett v. Connecticut Mutual Life Ins. Co., 55 App. Div. 628, 66 N. Y. Supp. 804, in reversing a judgment on a verdict for the plaintiff, the court said:

"There is proof of despondency. He was out of permanent employment, was in debt, and had family troubles. His declarations are shown, indicating intent upon his part to commit suicide."

"It is always proper to prove the intention as a fact, distinct from the actual death, and distinct from and preceding the perpetration of the act which caused the death. Any act or declaration made while this intention existed, and proceeding from it, whether expressly declaring the intention, or otherwise naturally tending to prove its existence, is necessarily of the res gestæ as to the intent and the intent is the main fact. As such it tends directly to prove the intention to commit suicide, which is often, if not always, a necessary part of the proof of the act itself." Rogers v. Manhattan Life Ins. Co., 138 Cal. 285, 71 Pac. 348.

If the evidence excluded had been admitted, facts would have been before the jury from which it would have been competent for them to find a motive. This, in connection with the physical facts attending the death, to wit, the orderly appearance of the room, the body of Edler clothed in nightclothes, lying quietly in his own bed, the strong smell of bitter almonds, the distinguishing characteristic of cyanide of potassium or prussic acid, the empty phial on the floor by the bedside emitting the same odor, the powerful smell of the same character found a few hours later, when the body was opened at the autopsy, and proceeding from it, might have procured a verdict for the defendant.

As the exclusion of the evidence was error, the judgment and order appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.