THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v RAYMOND LEACH, Respondent.

Second Department, May 23, 1977

*Eugene Gold, District Attorney (Helman R. Brook* and *Mark M. Baker* of counsel), for appellant.

*Zane & Zane (Martin E. Fiel* of counsel), for respondent.

RABIN, J. This is an appeal by the People from so much of an order of the Supreme Court, Kings County, as, following the rendition of a jury verdict convicting defendant of the crime of murder, granted, *nunc pro tunc* to the close of the trial evidence, a defense motion for a trial order of dismissal pursuant to CPL 290.10 on the basis of an alleged insufficiency in the circumstantial evidence of guilt. We believe that the order must be reversed, the verdict reinstated and the case remanded for the imposition of sentence.

### THE FACTS

On the morning of April 14, 1973, at or about 10:40 A.M., the body of one Anthony "Buster" Holston was found, lying face down, in the weeds adjacent to the Flatbush Avenue exit of the Belt Parkway in Kings County, New York, amid traces of blood and broken automotive glass. There was a large blood-stained area near the curb of the service road, some 30 feet from where the body was found; additional pieces of broken automotive glass and a number of blood-stained paper napkins from a Wetson's hamburger restaurant were present in the vicinity of the larger blood stain. The probable cause of death was stated to be a shotgun blast over the left temple.

Defendant was arrested and charged with the murder on May 25, 1973. His trial commenced before the court and a jury on April 28, 1975, and terminated in a verdict of guilty on May 8, 1975. The trial court, however, nullified that determination by granting a preverdict defense motion for a trial order of dismissal *nunc pro tunc* to the close of the trial evidence.

The issues raised on this appeal are (1) whether the order granting the motion for a trial order of dismissal (CPL 290.10) is appealable by the People and (2) whether the evidence offered at trial, circumstantial in nature, was sufficient to support the verdict.

## THE APPEALABILITY OF THE TRIAL ORDER OF DISMISSAL

Beginning with a consideration of the first issue presented, it is defendant's contention that by ordering dismissal of the indictment *nunc pro tunc* to the close of the evidence, the trial court "eradicated" all consideration of the jury's verdict for purposes of this appeal, "since the net effect of the order *nunc pro tunc* was to eliminate everything which occurred subsequent to the testimony of the last defense witness" from the record. Thus, it is argued, the jury's verdict has been rendered a nullity, and a reversal here will necessitate a new trial in violation of the constitutional proscription against double jeopardy, citing *People v Brown* (40 NY2d 381) and *United States v Jenkins* (420 US 358).

We cannot agree.

In *United States v Jenkins (supra)* the Supreme Court was confronted with a Government appeal from a trial order which dismissed the indictment following a nonjury trial, but under circumstances which precluded the high court from stating with certainty whether the dismissal had been predicated on a resolution of the factual issues adversely to the prosecution. The Government argued that the dismissal had not been so predicated, and that, while appellate reversal would mandate a retrial, such retrial would not be in violation of the proscription against double jeopardy since the facts had never been judicially determined. The Supreme Court rejected this analysis and held that the appeal was barred by considerations of double jeopardy, stating, *inter alia,* the following (420 US, at pp 369-370): "Here there was a judgment discharging the defendant, although we cannot say with assurance whether it was, or was not, a resolution of the factual issues against the Government. *But it is enough for purposes of the Double Jeopardy Clause,* and therefore for the determination of appealability under 18 U.S.C. § 3731, that *further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged, would*

*have been required upon reversal and remand.* Even if the District Court were to receive no additional evidence, it would still be necessary for it to make supplemental findings. The trial, which could have resulted in a judgment of conviction, has long since terminated in respondent's favor. *To subject him to any further such proceedings at this stage would violate the Double Jeopardy Clause"* (emphasis supplied).

Somewhat similarly, the Court of Appeals, in *People v Brown (supra),* held that a trial order of dismissal entered at the conclusion of the prosecution's case-in-chief was not appealable by the People, relying in part on *Jenkins,* and on its sister cases *United States v Wilson* (420 US 332) and *Serfass v United States* (420 US 377). Thus, the court stated (40 NY2d, at p 391): "On the basis of these three cases we conclude that the Supreme Court has formulated a double jeopardy rule— albeit what may be characterized as a mechanical rule—which precludes the People from taking an appeal from an adverse trial ruling whenever such appeal if resolved favorably for the People might require the defendant to stand retrial—or even if it would then be necessary for the trial court 'to make supplemental findings' *(United States v Jenkins,* 420 US 358, 370, *supra). Double jeopardy principles will bar appeal unless there is available a determination of guilt which without more may be reinstated in the event of a reversal and remand.* Application of such rule to the provisions of CPL 450.20 (subd 2) permitting the People to appeal from a trial order of dismissal renders that section unconstitutional *except in the instance where disposition of the motion is reserved until after the jury verdict has been returned"* (emphasis supplied).

Applying the logic of *Brown* and *Jenkins* to the facts at bar, it is clear that this case may be distinguished by virtue of the fact that the trial court here reserved decision on the motion until *after* the verdict had been returned, so that, upon appellate reversal, the same might be reinstated and the case remanded for the entry of judgment *without the necessity of a further trial.* Thus viewed, the case more closely resembles *United States v Wilson (supra),* where the Supreme Court sustained the Government's right to appeal from an order granting a postverdict motion to dismiss an indictment on the ground, *inter alia,* "that the constitutional protection against Government appeals [i.e., double jeopardy] attaches *only* where there is a danger of subjecting the defendant to a second trial for the same offense" (420 US, at p 336; emphasis

supplied). In *Wilson,* the court reasoned: "[s]ince reversal on appeal would merely reinstate the jury's verdict, review of such an order does not offend the policy against multiple prosecution" *(supra,* pp 344-345). Similarly here, there need be no second trial and the proscription against double jeopardy will not be offended.

In the absence of clear authority to the contrary, we are unpersuaded by defendant's contention that the entry of the order *nunc pro tunc* to the close of the trial evidence rendered the verdict a nullity for all purposes, thereby precluding its reinstatement and rendering a new trial a necessity. Such an approach would appear to exalt "form" over "substance", and is directly contrary to the expressed intent of the trial court in letting the case go to the jury "so that the entire record, in the event of an appeal would be before the Appellate Court." In short, we are of the opinion that the appeal is properly before us (see CPL 450.20, subd 2).

### THE SUFFICIENCY OF THE TRIAL EVIDENCE

Turning to a consideration of the second issue presented, it is defendant's contention that even if the order be appealable, it was, nevertheless, properly entered, as there was insufficient circumstantial evidence of guilt adduced at the trial to sustain a conviction. Again, we disagree.

In *People v Benzinger* (36 NY2d 29, 32), the Court of Appeals had recent occasion to consider the question of the quantum of circumstantial evidence necessary to sustain a conviction, and summarized its prior holdings on the subject as follows: "The oft-stated rule with respect to convictions based exclusively upon circumstantial evidence is that for guilt to be proven beyond a reasonable doubt the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them; and the facts proved must exclude 'to a moral certainty' every reasonable hypothesis of innocence. (E.g., *People v. Borrero,* 26 N Y 2d 430, 434-435; *People v. Cleague,* 22 N Y 2d 363, 365-366.) The reason for the current application of this rule is not that circumstantial evidence is thought to be weaker than direct evidence, since the reverse is frequently true. Rather, the rule draws attention to the fact that proof by circumstantial evidence may require careful reasoning by the trier of facts. By highlighting this aspect, the rule hopefully forecloses a danger legitimately associated with circumstantial evidence—that the trier of facts may leap

logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree (see *People v. Cleague, supra,* at p. 367). In the end the application of the test becomes 'a question whether common human experience would lead a reasonable man, putting his mind to it, to reject or accept the inferences asserted for the established facts.' *(People v. Borrero, supra,* at p. 435; *People v. Wachowicz,* 22 N Y 2d 369, 372.)" Since the issue here is one of the sufficiency of the circumstantial evidence, we view the facts most favorably to the People, and assume that the jury credited the prosecution's witnesses and gave to their testimony the full weight that it might reasonably be accorded (see *People v Benzinger, supra,* p 32; *People v Lagana,* 36 NY2d 71,73; *People v Cleague,* 22 NY2d 363). Viewed in this light, we believe that the evidence was sufficient to sustain a conviction.

Defendant made a total of three statements to the investigating authorities, two of which were stenographically recorded and ultimately transcribed. All three of these statements were introduced into evidence at the trial, although the defendant himself did not take the stand.

During his initial interview with Detective Carrasquillo, defendant stated that he had been in an overnight card game with the decedent on April 12 and 13, 1973, and that he had lost a total of about $60 to the latter. The pair then exited the restaurant where the game had been held, got into defendant's cab and drove to a bank, where the defendant proceeded to cash a check for $120 and paid his debt to the decedent. (A second check, also dated April 13, 1973, and drawn to the order of "Cash" in the amount of $1,340, was explained as being the result of an error in draftsmanship and was never cashed.) After cashing the smaller check, defendant and the decedent drove over to a Wetson's, where they ate in the car. They then stopped briefly at a Pontiac dealer, and, at or about 6:30 P.M., defendant dropped the decedent off at a card game and left. According to the defendant, he never saw the decedent again and, later that evening, a window in the cab became broken as the result of a quarrel between two passengers.

Upon further interrogation, however, defendant altered his story to provide that he *had* seen the decedent later that evening, as the latter had instructed him to return at or about 8:30 P.M. to pick him up. Defendant complied with this request and, when he arrived at the designated location, the decedent

and two other men got into the cab. Defendant then drove (as directed) to a deserted parking lot on West 16th Street in Sheepshead Bay, where, following a series of events from which he determined that the decedent owed these men or their principals some $33,000 which he was unable to pay, the decedent was shot once in the head by each of the two men (first with a .38 caliber pistol and then with a .45). One of the two men then drove the cab to the Flatbush Avenue exit of the Belt Parkway, where they left the decedent's body in the weeds. They then drove off in a second car after telling the defendant to keep quiet about what he had seen. Defendant cleaned up the cab and had the window (which had been broken by the gunfire) replaced.

After completing his statement, defendant tried, unsuccessfully, to identify various mug shots, and then led the police to the parking lot on West 16th Street, and then to the place where the body had been found. In the parking lot on West 16th Street some ball bearings ("shot") and pieces of automotive glass were discovered. (Defendant's two subsequent statements conformed generally to the final version as stated above.)

From the further evidence adduced by the prosecution, it may be deemed established: that on the evening of April 12, 1973 through the morning of April 13, 1973, defendant and the decedent participated in a card game during which the former lost a considerable sum of money (in excess of $1,000) to the latter; that the decedent, a loan shark, repeatedly cautioned the defendant as to his ability to pay; that after the card game, defendant and the decedent left the area together in defendant's cab; that prior to entering defendant's cab, the decedent stopped briefly at his pool room (located across the street); that it was decedent's practice to keep a shotgun in the pool room for use while collecting "debts"; that the decedent's partner entered the pool room shortly thereafter and found that the shotgun was gone; that the defendant and another visited his (the defendant's) bank on the afternoon of April 13, 1973 and tried unsuccessfully to cash a check for $1,340; that upon being informed that the check could not be cashed, the defendant tried unsuccessfully to have the bank manager make a false explanation of this fact to his companion; that at or about 12:00 midnight on April 13, 1973, defendant returned to the scene of his card game with the decedent and informed the manager of the restaurant that he

had paid off the decedent and that he believed the latter to be on his way over to the restaurant; that the defendant knew where the body had been found; that he had lied to the police about the extent of his gambling losses and the $1,340 check; that he had given the police two separate versions of the events on the evening in question (contending that the final version was the correct one); that, according to the defendant's own statement, the murder had occurred in his cab; that he had had a cab window replaced on April 16, 1973; that traces of human blood were found in the cab; that the Medical Examiner had fixed the probable cause of death as a solitary shotgun blast in the head; and that the "shot" discovered in the parking lot on West 16th Street resembled commercial ball bearings and bore no evidence whatsoever of having been fired from a weapon. Moreover, the jury was apparently unimpressed with defendant's version of the crime.

Given the totality of this trial evidence, we believe that the requisite quantum of circumstantial evidence has been adduced, and that the hypothesis of defendant's guilt not only flows naturally from the facts proved, but is consistent with them and the facts proved exclude to a moral certainty every reasonable hypothesis of defendant's innocence of the crime charged (see *People v Benzinger,* 36 NY2d 29, 32, *supra; People v Lagana,* 36 NY2d 71, 73-74, *supra).* The People's evidence establishes motive, places the defendant at the scene of the crime at the time of the shooting, demonstates clearly that he lied about salient facts, and supports the conclusion that his version of the murder is at variance with the truth. Moreover, in the absence of any contrary theory, the nature of the wound itself bespeaks an intentional infliction. From all of the evidence, the jury could have found beyond a reasonable doubt that the defendant shot the decedent with the requisite intent.

### CONCLUSION

We therefore conclude that the order appealed from should be reversed insofar as appealed from, the verdict reinstated, and the case remanded for the imposition of sentence.

MARTUSCELLO, J. P., COHALAN and MOLLEN, JJ., concur.

Order of the Supreme Court, Kings County, entered October 8, 1976, reversed insofar as appealed from on the law; the jury

verdict is reinstated; and case remanded to Criminal Term for the imposition of sentence.