Duncan S. McNab, J.
Defendant Eugene Lauro stands charged with the crime of manslaughter in the first degree for allegedly having intentionally caused the death of his wife, Angie Lauro, with a shotgun, while acting under an extreme emotional disturbance. During trial, two novel questions of law arose; in the first, the court was asked to rule, and did rule, on the admissibility of certain evidence obtained by means of a procedure known as the "trace metal detection test;” the second, and equally unusual issue, which the court will treat first, involves the so-called "Hillmon doctrine” enunciated in Mutual Life Ins. Co. v Hillmon (145 US 285 [1892]). This issue never was the subject of a formal application on the record; rather, the People informed the court, by way of a memorandum of law, of their intent to present a witness who would ostensibly testify, on the People’s direct case, about the intention of the deceased to present to her husband, a few days before her death, a financial offer in the nature of an ultimatum at a time when marital relations between them were strained. Under Hillmon (supra), the People sought to offer this testimony as proof that Angie Lauro carried out her intention and confronted the defendant with this offer, in order to establish a motive for this alleged crime. In view of the novelty and potential impact of such testimony, the court chooses to take this opportunity to analyze this issue and formally discuss the reasons why it could not permit such testimony to be introduced.
Preliminarily, the court would note that there were no eyewitnesses to this alleged crime, which allegedly occurred in the third-floor bedroom of the Lauro’s home at 32 Ridgeview *708 Avenue, White Plains, and, as a result, the People’s case rested entirely upon circumstantial evidence. The People’s proof at trial, in brief outline form, was based on the following testimony: that at approximately 7:00 a.m. on February 10, 1976, the defendant was found by his daughter, Claudia Lauro[1] (then 13 years old) and a housekeeper, Cecilia Sandoval, sitting in a chair in his living room on the third-floor of the premises, several empty liquor bottles and one or two guns on the floor near his chair (Claudia recalled seeing one rifle; Mrs. Sandoval testified, at different points, to seeing one or two); Mrs. Lauro was pronounced dead at 7:45 a.m. lying face up in bed, having suffered a mortal wound to the face which, in the opinion of Assistant Westchester County Medical Examiner Dr. Louis Roh, was consistent with a shot fired from a 12-gauge shotgun. One of the guns found in the living room was later identified as a semi-automatic 12-gauge shotgun; and a red mark was observed by an officer at the scene, just under defendant’s right shoulder, which in the opinion of Investigator Joseph Reich, a qualified ballistics expert, could have been caused by the recoil of firing such a shotgun.
Additionally, Claudia Lauro and Cecilia Sandoval further testified that Mr. and Mrs. Lauro had not been sharing the same bedroom and that they were only speaking to each other when necessary prior to February 10, 1976.
Defendant, on the other hand, essentially contended that the circumstantial proof offered by the People was insufficient to prove his guilt. He suggested that someone else could have committed the alleged crime, stressing Claudia Lauro’s testimony on cross-examination that at some point early in the morning of February 10, 1976, when she awoke to a "vibration”, she had also heard "heavy footsteps” on the lower floor; both Claudia and Mrs. Sandoval also confirmed that several "roomers” were living on the lower two floors at that time.[2] Alternatively, the jury had before it considerable testimony to show that defendant appeared to have been under the influence of alcohol when arrested that morning, raising a second *709 issue as to whether defendant had been too intoxicated at the time of the alleged crime to have intentionally caused his wife’s death.
The jury, in two days of deliberations, reported three times that they were hopelessly deadlocked; on defendant’s application, following the third such note, the court granted a mistrial.
THE HILLMON DOCTRINE
It is against this background that the People sought to offer the testimony of a witness as to the deceased’s stated intention to approach the defendant with a financial ultimatum.
It is not disputed that declarations showing a declarant’s then existing state of mind are admissible when relevant. (Richardson, Evidence [10th ed], § 288.) However, the People here sought to go further. Under the rather extraordinary doctrine of Mutual Life Ins. Co. v Hillmon (supra), testimony regarding the state of mind, or intention, of the declarant may be used inferentially to prove other matters which are in issue. That is, from testimony showing the declarant’s intention to perform a particular act, the trier of fact, under Hillmon, may draw the inference that the person carried out his intention and performed the act. (And, see, United States v Pheaster, 544 F2d 353.) In Hillmon (supra), a civil action on certain life insurance claims, the defendant insurance companies contended that the person killed in a campsite at Crooked Creek, Kansas, was not Hillmon, but one Walters. In support of their position, the defendants sought to introduce two letters written by Walters shortly before he disappeared, stating that he intended to leave Wichita in the near future and to travel with a man named Hillmon. The United States Supreme Court, in holding the letters to be admissible, stated (pp 295-296): "the letters in question were competent * * * as evidence that * * * he [Walters] had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon”. This ruling, the so-called "Hillmon doctrine” has been followed, although not without a certain amount of controversy, in other jurisdictions.[3] (See United States v Pheaster, supra [noting that it was *710 not surprising that Hillmon should create controversy and confusion, since it is an "extraordinary doctrine”]; People v Alcalde, 24 Cal 2d 177; and, see, Maguire, The Hillmon Case— Thirty-three Years After, 38 Harv L Rev 709.) Significantly, the courts in both of the above-cited cases allowed witnesses to testify, that on the respective days in question, the victim had said that he or she intended to meet the defendant that evening, as some proof that they were in fact together on the night of the crime, from which the jury might infer guilt.[4] In the instant case, however, the People seek to go farther. The People, in effect, would have the jury draw the following series of inferences: (1) that Angie Lauro did perform the act intended, i.e., confront the defendant with her "ultimatum” financial offer; (2) that he reacted adversely to such a proposal; which in turn, (3) provided the defendant with a motive to kill; and (4) ultimately led him to actually kill his wife Angie with a shotgun. It strikes the court that such proposed proof would go beyond the narrowly drawn confines of the Hillmon — Pheaster—Alcalde triumvirate, allowing proof of a party’s stated intent to meet someone else as proof that such meeting actually took place. It is this broad proposed application of Hillmon in the instant case which this court feels flies in the face of well-settled case law in our State on the use of circumstantial evidence. (See, in particular, People v Cleague, 22 NY2d 363; People v Borrero, 26 NY2d 430; People v Leach, 57 AD2d 332.) While these cases are careful to point out that the myth of the purported superiority of direct evidence has long since been exploded, they also note that there is one great problem associated with the use of circumstantial evidence — namely, "that the trier of facts may leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree” (People v Leach, supra, pp 336-337 [citing People v Cleague, supra, p 367]). Our state Court of Appeals has stated: "circumstantial evidence is as nothing unless the inferences to be drawn from the circumstances are logically compelling. The danger, therefore, with circumstantial evidence is that of * * * subjective inferential links based on probabilities of low grade or insufficient degree — which, if undetected, elevate coincidence and, therefore, suspicion into *711 permissible inference.” (People v Cleague, supra, p 367; emphasis added.) It is precisely on this ground that the Hillmon doctrine, in the broad manner the People seek to apply it in the instant case, comes into direct conflict with the well-settled standards followed in this jurisdiction with respect to circumstantial evidence. The People simply would have the jury leap too many gaps, and pile inference upon inference, in order to reach their sought after conclusion. Thus, the People’s application to admit the statement of the deceased’s heretofore described intent, through the testimony of one purportedly present at the time she stated it, had such application formally been made on the record, would have been denied.
TRACE-METAL DETECTION TEST
Also on their direct case, the People sought to introduce, through the testimony of Patrolman Robert Kulls of the White Plains Police Department, the results of a certain scientific test, heretofore unknown to this court, called the "trace-metal detection test”. This test, related somewhat to fingerprint analysis, is designed to determine if one has recently held a metal object.
To assist the court in ruling on this test’s admissibility, an offer of proof was presented, outside the presence of the jury, wherein Patrolman Kulls testified, inter alia, as follows: that the above-named test was first developed for the United States Army in Vietnam; that the test itself essentially involves the application, by cotton swab or aerosol spray, of a premixed solution to the desired area of the body; that the solution is allowed to dry; and that, upon turning off all other lights, the tested area is placed under ultraviolet light, thereby causing it to give off various colors in various patterns; theoretically, the particular color of the tested surface would then, by reference to color charts, indicate contact with a particular type of metal; kulls testified that the intensity of the color revealed would depend on the time of the contact with the metal surface and its duration, but that neither the type of color nor its intensity would be affected by the amount of solution used in the test; he also noted that the trace-metal test would pick up contact with a metal surface made within 48 hours from the time of contact, including contact with clothing.
Specifically, in the instant case, Kulls applied the solution to defendant’s hands, up to the wrist, as well as to his chest *712 and right shoulder, and let the solution dry for three minutes. Under the ultraviolet light, he then observed a dark purple color, purportedly indicative of steel or iron, from the tips to the first joint of the fingers on defendant’s left hand, followed by a band of yellow, indicative of an absence of any contact with metal, extending midway down the third joint of the fingers; and finally, Kulls observed a second purple band extending from midway down the third joint into the palm. He also observed a very dark purple color on the index finger of the right hand and three small purple spots on defendant’s right shoulder.[5] (The People, of course, would have the jury infer that the location and pattern of the purple coloration on defendant’s hands would indicate that defendant recently held an object made of iron or steel, to wit, the 12-gauge shotgun allegedly used to shoot his wife, Angie Lauro.) While defendant, a jeweler by trade, was not handcuffed during this test, administered at 10:45 a.m. on February 10, 1976, Kulls conceded that the defendant had been handcuffed following his arrest earlier that morning.
Kulls further stated that this was the first time he had performed this test; that he had no idea whether the potency of the premixed solution diminished or expired over time; and that he had no knowledge whether this test had been recognized in any jurisdiction.
While "perfection in [scientific] test results is not a prerequisite to admissibility,” a scientific test must have gained general acceptance in its particular field to warrant judicial recognition. (People v Leone, 25 NY2d 511, 517.) Here, there is absolutely no testimony before the court as to this test having been received in any court or in the literature of forensic science; nor is there any scientific data presented to show the reliability of this test. Moreover, while Patrolman Kulls testified concerning this test in a thoroughly competent and candid manner, he concededly had never performed this test previously. Where a scientific procedure is first employed, it is proper for the court to require "rigorous prerequisites” to authenticate the reliability of the procedure in question, as *713 the Court of Appeals recently noted, per opinion of Jones, J., in People v Gower (42 NY2d 117 [1977]). Here, such prerequisites clearly were entirely lacking.
The court is well aware of the great weight which such a test could conceivably have in the minds of the jury[6] (see People v Leone, supra, p 518). Thus, while this court does not preclude the possibility of this test becoming, under carefully controlled scientific conditions, and in the hands of one specially trained, a helpful law enforcement tool, there is unquestionably at this point in time completely insufficient evidence as to the accuracy and general scientific acceptance of this test. Thus, the People’s application to introduce the results of the trace-metal detection test herein is hereby denied.

. On the People’s application, the minutes of Claudia Lauro’s testimony at a preliminary hearing were read into the record, following a determination that this witness, presently residing in Minnesota, was unavailable for trial pursuant to CPL 670.10 and CPL 670.20, due to the refusal of a Judge of the District Court for Hennepin County, Minnesota, to turn Claudia Lauro over to this jurisdiction as a material witness, and that the preliminary hearing minutes had afforded the defendant adequate cross-examination of this witness.

. The premises at 32 Ridgeview Avenue were duly licensed as an old-age home.

. In our own jurisdiction, the court is aware of one case, Goldschmidt v Mutual Life Ins. Co. (134 App Div 475), wherein Hillmon is cited; it is a civil case, involving a defense of intentional suicide in an action on a life insurance policy, in which Hillmon is utilized in the context of showing, as part of the res gestae, the decedent’s *710 financial and mental condition immediately prior to the time of his death; thus, while Goldschmidt does offer a very limited precedent for invoking this doctrine in New York, it cannot be seen as controlling in the criminal case at bar.

. In each of these cases, there was also independent proof to place the defendant with the victim on the day in question.

. As previously noted, there was also testimony from an officer at the scene (Patrolman James Higgins) that defendant, earlier that same morning, had had a "red mark”, some 4 inches long and 3 inches wide, under the right shoulder area. Assuming that the People would have also offered this testimony as some proof that defendant fired the shotgun (by way of absorbing the full impact of its recoil), then the trace-metal test’s positive finding of the "three little dots”, at a location different from that of the 4-inch long red mark, must be seriously questioned.

. Additionally, it is not disputed that defendant had been in handcuffs earlier in the morning of February 10, 1976, when the test was administered, raising the distinct possibility that the metal surface defendant touched, if any, closest to the time of the test, may have been these handcuffs. Moreover, it was also revealed that defendant makes his living in the jewelry business and that this test would ostensibly pick up contact with metal surfaces within 48 hours prior to the test. While strictly speaking a question going as much to weight as to admissibility, the court is quite concerned, especially on the facts presented here, that a positive test result could be completely misleading and lacking in probative value.