OPINION OF THE COURT
Duncan S. McNab, J.
Defendant and codefendant Jordan Marcus stand charged with the clawhammer murder of David Moriarty on April 16,1981. Separate trials were previously ordered. During the trial of defendant Borcsok, a question arose, apparently of first impression in this State, concerning certain tests conducted on various bloodstains found hear the scene and from within defendant’s car following his apprehension on April 25, 1981, and upon samples of the victim’s blood taken during his autopsy. Specifically, the People sought to offer evidence of blood typing, not by way of the customary ABO system, but rather, by way of enzyme analysis of the blood, for the stated purpose of showing that the blood of a relatively small percent of the white population (i.e., 10%-11%), including the victim, Mr. Moriarty, contains both enzymes found in certain of the recovered bloodstains.
*811 Upon an evidentiary hearing, held outside the presence of the jury, the court heard testimony from Mr. Fred Drummond, the assistant chief at the Westchester County Department of Labs and Research, and the head of their serology department. Mr. Drummond was qualified, without objection, as an expert in the field of serology. (Also incorporated as part of the hearing was the testimony given before the jury by Mr. Drummond’s assistant, Mr. Robert Adamo, largely confined to rather innocuous background information.) Collectively, the two serologists testified in substance that commencing in 1979, they participated in a yearlong population study of Westchester County, wherein some 481 blood samples were analyzed and “typed” in order to isolate three particular enzymes, or genetic “markers”, identified for purposes of brevity as PGM, ESD, and EAP. Other identifiable enzymes, such as carbonic anhydrase (CA), were not tested for. All samples were taken under clinical conditions by various physicians from what was hoped to be a representative cross section of various segments of the county population, i.e., whites, blacks and Hispanics. No sample of blood included in the test samples was more than seven days old. Nor were any samples taken from inanimate objects or otherwise obtained from the field. Using a technique known as electrophoresis Mr. Drummond testified that certain percentages of the white, black and Hispanic populations of this county possess blood containing certain subtypes of the three enzymes analyzed. The Westchester study, as yet, has not been published.
Drummond also testified that previous enzyme studies have been conducted nationwide which have received general acceptance in the scientific community. The results of these studies, conducted in Miami, Detroit, Los Angeles, Seattle, Austin (Texas), Pittsburgh, and England, were received in evidence at this hearing. Drummond testified that the results of those published tests, in terms of frequency of population containing a particular enzyme, were very close to the results achieved in Westchester, despite the fact that the size of the sample pool in certain of the tests exceeded that used here (i.e., in the test for EAP there was a sample pool of 1,239 Caucasians in Pittsburgh, as *812 compared to 503 in Detroit), while in other areas, the sample pool was less (i.e., the sample pool in Miami contained 350 Caucasians; in Los Angeles, 219; and in Seattle, 193). The court’s independent examination of the various published test results served to confirm Mr. Drummond’s contention that the results of the Westchester study were close to those obtained elsewhere.
Drummond further testified that he received the complied statistical data pertaining to these prior enzyme population studies from Dr. Robert Shaler, the head of serology in the New York City Medical Examiner’s office, and under whose tutelage Mr. Adamo had completed his internship. Dr. Shaler, in Mr. Drummond’s opinion, had been an instrumental figure in the earlier studies; additionally, Drummond testified that the methodology used here in the Westchester study was essentially a modification of techniques previously employed by Dr. Shaler, techniques which are now accepted in the field of forensic serology, the basic research on the subject having been done some 15 years ago.
At the threshold, the court held, as a procedural matter, that these various prior studies were properly admissible into evidence at this hearing under the authority of People v Sugden (35 NY2d 453), and People v Stone (35 NY2d 69). As the court held in Sugden (supra, p 460), an expert witness (there, a psychiatrist), “may rely on material, albeit of out-of-court origin, if it is of a kind accepted in the profession as reliable in forming a professional opinion.” As Mr. Drummond testified, the methodology employed in those prior studies which he relied on here has now gained general acceptance in its particular field; hence, under Sugden (supra), the results of the previous enzyme tests, as compiled by Dr. Shaler, like Drummond an expert in this highly specialized area, are admissible.
Turning to the merits of the issue, this court has, on a prior occasion, found the results of a certain scientific test known as the “trace metal detection test” to be inadmissible. (See People v Lauro, 91 Misc 2d 706.) However, in this court’s view, the facts in Lauro were greatly different from those presented here. In Lauro (supra), the court was faced with the testimony of a patrolman with the White Plains *813 Police Department, who had actually performed the trace metal test himself for the very first time; moreover, the court in Lauro had absolutely no testimony that such a test had heretofore been recognized in any jurisdiction or in any of the literature. Here, to the contrary, the court has the testimony of Mr. Drummond, an acknowledged expert in his field; the testimony that the prior enzyme analysis studies have gained acceptance in the scientific community,[1] and the further testimony that the criteria and methodology employed in the Westchester study, with certain modifications, largely paralleled the techniques used in the earlier studies. Thus, Lauro (supra) would appear to be fully distinguishable, as would the holding of People v Cohen (50 NY2d 908, 910) where the Court of Appeals found certain test results involving “other suicides purporting to show, statistically, how far from his body a suicide victim holds The gun’ ”, to have been improperly received into evidence, where there was “nothing in the record * * * to indicate that the sampling was representative, that reliable criteria were employed, or that the conclusions on which the statistics were based were in fact accurate.” Here, on the other hand, the record does reflect that the instant study drew from a representative sample, comparing favorably with several of the prior studies nationwide, and that the samples were selected based upon various criteria. Thus, the People have established, in this court’s view, a sufficient foundation, bearing in mind the general acceptance accorded to the prior studies and the particular techniques used in the present study.
Moreover, the court here is not faced with the unique problem which confronted the court in People v Alston (79 Misc 2d 1077). There, in a well-reasoned opinion, the court, Judge Kapelman, ruled that the results of scientific tests *814 performed in an attempt to determine the sexual origin of white blood cells and epithelial squamous cells retrieved from 22-month-old dried blood stains found on defendant’s jacket were inadmissible. The court there was particularly-troubled by the fact that certain of the expert witnesses had testified that any conclusions reached from tests performed on 22-month-old blood were unreliable since, in blood stains that old, “cell proteins might change due to enzyme activity in the cell itself” (supra, p 1084). Beyond that, the court there had the added problem that there was, at that point in time, only one body of test results in the field, performed on dried blood stains 10 months old and less by Doctors Noguchi and Ishizu in California; none of those test results had as yet been duplicated by other scientists. Here, to the contrary, none of the 481 blood samples used in the Westchester population study was more than seven days old; moreover, Drummond in many ways sought to duplicate the procedures previously used by Dr. Shaler and others. Hence, Alston (supra) appears to be distinguishable from the instant case. (See, also, People v Goldfaden, 52 AD2d 790.)
A proper foundation having been laid, the rule in New York is that “[ejxpert testimony is admissible if the analysis involved is beyond the ken of the typical juror and the results would be relevant to an issue in the case” (see People v Allweiss, 48 NY2d 40, 50). Certainly, there can be little doubt that the results of blood typing by way of enzyme analysis is well beyond the knowledge of an average juror; moreover, the results of tests performed on bloodstains recovered near the scene and from defendant’s car are clearly relevant, particularly where the People’s case, in part, consists of circumstantial evidence. (The People are also offering evidence of alleged admissions made by defendant to a private party, Mr. Steven Crowley, evidence which under the recent cases is deemed a form of direct evidence.) (See People v Licitra, 47 NY2d 554; People v Rumble, 45 NY2d 879.) Finally, the court is not confronted here with the problem presented in People v Macedonia (42 NY2d 944), where a large proportion of the general population had blood of the same type as defendant, *815 [2] there, type “A” blood, under the more familiar ABO typing system (cf. People v Davis, 41 NY2d 678). Here, since Mr. Drummond, using the enzyme analysis typing system, will be able to testify, with a reasonable degree of medical certainty, that a much smaller percentage, i.e., some 10%-11% of the white population, including the victim, has blood containing both of the enzymes recovered from certain of the recovered blood stains, the court would find the evidence to be legally admissible.
Defendant’s motion to preclude, and the companion motion to strike Mr. Adamo’s testimony, is hereby denied in all respects.
(July 7, 1982)
By way of footnote, following the citation to People v Davis (41 NY2d 678) at page 815 of the above-noted opinion, the court would also call attention to the very recent opinion in Matter of Abe A. v District Attorney, N. Y. County (56 NY2d 288). There, in the course of reinstating a lower court order compelling a suspect in a homicide investigation to supply the People with a sample of his blood, the court stated (p 299) “[t]he scientific validity and reliability of tests used to identify the type of blood a particular individual carries and to determine whether the blood of one person matches that of another are well recognized in both the medical and legal communities”. The court in Abe A. (supra, p 299) also went on to distinguish the holdings in People v Macedonio (42 NY2d 944) and People v Robinson (27 NY2d 864), noting that “the relative rarity of the assailant’s type of blood” (i.e., found in less than 1% of the population) “relegates arguments as to remoteness to the realm of weight rather than admissibility”.

. While the court’s decision herein is based strictly on the testimony adduced at this hearing, the court is aware of one other case, decided by the Kansas Court of Appeals, wherein the analysis of blood samples for the presence of enzymes and proteins, using the so-called “Multi-System” method of blood analysis, was held admissible in a criminal case. (See State v Washington, _ Kan App _, 28 Cr L R 2449; see, also, contrary decisions of different panels of the Michigan Court of Appeals on the somewhat related subject of blood secretion evidence in People v Horton, _ Mich App _, 28 Cr L R 2236, and People v Sturdivant, _ Mich App _, 26 Cr L R 2123.)

. Mr. Adamo testified here that 36.88% of the white population has type “A” blood.