490 A.2d 1307

**Frankie SMITH**

v.

**STATE of Maryland.**

**No. 1121, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

April 15, 1985.

628

Arthur A. DeLano, Jr., Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Zvi Greismann, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, Sandra A. O'Connor, State's Atty., Baltimore County, and Ann Brobst, Asst. State's Atty., Baltimore County, on brief, Towson), for appellee.

Submitted before WEANT, ALPERT and KARWACKI, JJ.

WEANT, Judge.

On the morning of 16 June 1982, Gerald Klinger, a resident of eastern Baltimore County, discovered the body of Demetrius Kelly in his front yard under some shrubbery.

Lying nearby was an opened pack of Newport cigarettes. Police were never able to identify any eyewitness to the killing, but Klinger related that he heard a gunshot the day before at about 10:20 p.m. He looked out of a front window; he saw a large car which was parked; he heard voices but could not discern what was said. Investigators later concluded that Kelly had been shot once in the head, and his body dragged from the road.

Several witnesses who were friends of Kelly saw him in Baltimore City on the night of 15 June. He was wearing several gold chains. (Significantly, no gold chains were found on Kelly's body.) Kelly was riding in a gold-colored car badly dented on the driver's side. Two witnesses identified the appellant, Frankie Smith, as the driver of the car that night.

Police stopped Smith on the afternoon of 16 June. A witness at the scene, who saw Kelly with Smith the night before, identified appellant and his car. The police questioned Smith at Baltimore County Police Headquarters. They also searched Smith's gold and black Ford Maverick after he executed a search consent form. A gold chain was concealed in a hole in the glove compartment. Members of Kelly's family identified the chain as Kelly's. A rear door of the car had stains which later proved to be blood. An opened pack of Newport cigarettes was on the front seat.

By indictment the State charged Smith with murder in the first degree, robbery with a deadly weapon, use of a handgun in the commission of. a felony, and theft. In a trial by a judge sitting without a jury, the Circuit Court for Baltimore County convicted Smith of murder in the second degree and theft of property of $300 value or more. On appeal, Smith raises the following questions:

1. Did the trial judge err in denying Appellant's motion to suppress?

2. Did the trial judge err in admitting the results of the blood enzyme testing?

3. Was the evidence sufficient to sustain Appellant's conviction?

## 1.

At trial, appellant moved to suppress two oral statements he made to the police as well as evidence obtained from the search of his car. As to the oral statements, he argued that his first statement should be suppressed because he was in police custody but had not been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at the time he spoke. In addition, he claimed that the police obtained his second statement by continuing questioning after he had asked to see an attorney. Further, Smith claims that the State did not reveal the "substance" of his oral statements despite defense counsel's request, thereby violating Md.Rule 4–263(b)(2) (formerly Rule 741(b)(2)). The trial court agreed that those statements that were not disclosed pursuant to former Rule 741 should be suppressed, but denied the rest of the motion. The court denied appellant's motion to suppress the results of the car search on the basis that Smith voluntarily consented to the search.

■ Taking these arguments in order, we conclude that appellant volunteered the first statement before the police had taken him in their custody. Smith testified that the police had their guns drawn when they initially stopped him, but he admitted that they holstered their guns thereafter. The police asked Smith to accompany them to police headquarters; one of the detectives, however, testified that he told Smith both after the initial stop and at headquarters that he was not under arrest and was free to leave. Smith was not handcuffed at any time. Under these circumstances, the trial court was correct in finding that Smith's first statement did not arise out of a custodial interrogation, so that the *Miranda* warnings were not mandated.

■ Appellant's second statement came after the detectives had arrested him and delivered the *Miranda* warnings. The trial court's finding that Smith made this state-

ment *before* he terminated the questioning by requesting an attorney was amply supported by the record and should be affirmed. Md.Rule 1086. Accordingly, the court's refusal to suppress this evidence must stand.

■ Next, we consider the State's failure to comply with the discovery provision of Md.Rule 4–263(b)(2). The trial judge granted the appellant's motion to suppress, ruling that the court would "[j]ust consider that which is put forth in the discovery area." This was an appropriate sanction. We find no basis for imposing the requested total exclusion of Smith's oral statements.

■ Finally, we agree with the trial court that appellant voluntarily consented to the search of the car. At trial Smith testified that the detectives represented to him that they would obtain a search warrant if he did not consent. This was arguably inconsistent with the detective's testimony, and the trial judge indicated that he was not convinced by appellant's version. Even if we were to accept appellant's scenario, we do not believe that his consent was coerced in light of the "totality of all the circumstances" presented in this case. *Humphrey v. State,* 39 Md.App. 484, 489, 386 A.2d 1238, 1242, *cert. denied,* 283 Md. 733 (1978). Our decision in *Whitman v. State,* 25 Md.App. 428, 336 A.2d 515 (1975), is inapposite. Many of the factors indicating coercion in that case are not present here. Significantly, Smith was not in custody at the time of his consent.

### 2.

At trial the State produced an expert witness, Connie Bacasnot, who was a forensic chemist employed by the Baltimore County Police Department. Ms. Bacasnot testified as to blood group tests she had performed to compare the stains found on the door of Smith's Maverick and other items with the blood of Kelly. She related, without objection, that the stain was human blood with the same A–B–O classification and Rh factor as the victim's blood. Appellant did object, however, to the expert's testimony concern-

ing blood enzyme tests [1] performed on the victim's blood and the stain on the car door. The results of these tests showed identical enzyme breakdowns. Further, she testified that these enzyme characteristics were shared by only 4–5% of samples she had tested previously.

The Court of Appeals has adopted the prevailing test for the reliability and admissibility of a scientific technique or process: it must be " 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *Reed v. State,* 283 Md. 374, 381, 391 A.2d 364, 368 (1978) (emphasis deleted) (quoting *Frye v. United States,* 54 U.S.App.D.C. 46, 47, 293 F. 1013, 1014 (1923)). This standard was later applied in *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983), where the Court held that the *Frye* standard was not limited to chemical and biological tests, including blood tests, but extended to hypnosis as well. 296 Md. at 679–81, 464 A.2d at 1033–34. Accordingly, we conclude that the *Frye* standard is applicable in this case.

Ms. Bacasnot testified at trial that the EAP and PGM blood enzyme analyses have been used in the scientific community "since 1965." Further, she testified that the procedures are accepted "worldwide" and that there is no difference of opinion as to the tests' validity, at least among forensic chemists.

Although admissibility of a scientific technique does not depend on a trial court's acceptance of a particular expert's endorsement in a particular case, *see Reed,* 283 Md. at 387–88, 391 A.2d at 371, the evidence in this case indicates a consensus in the forensic chemistry community as to the reliability of the blood enzyme tests. Further, courts in other jurisdictions have reached the same conclusion. For example, the Supreme Court of Kansas held that blood enzyme tests satisfied the reliability requirement laid down in *Frye. Kansas v. Washington,* 229 Kan. 47, 56, 622 P.2d

---

1. Ms. Bacasnot conducted tests for two types of enzymes, erythrocyte acid phosphatase (EAP) and phosphoglucomutase (PGM).

**634**

986, 993 (1981). *See also New York v. Borcsok,* 114 Misc.2d 810, 452 N.Y.S.2d 814 (1982).

### 3.

■ Finally, we conclude that the prosecution produced sufficient evidence to support appellant's conviction as a principal. Though there was no direct evidence of the murder, such as eyewitness testimony, there was substantial circumstantial evidence linking Smith to the crime. For example, several witnesses saw Smith with Kelly in Smith's car shortly before the murder; police arrested Smith the next day in that car, which had stains matching the victim's blood; and Kelly's family members identified a necklace hidden in the car as the victim's. The circumstantial character of this evidence certainly does not preclude a conviction. *Nichols v. State,* 5 Md.App. 340, 350–51, 247 A.2d 722, 728 (1968), *cert. denied,* 253 Md. 735 (1969). On the whole, there was ample evidence to permit a rational finder of fact to find the appellant guilty beyond a reasonable doubt of murder in the second degree. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980).

*JUDGMENTS AFFIRMED.*

*COSTS TO BE PAID BY APPELLANT.*