## Commonwealth v. Middleton

*Roger King, assistant district attorney,* for the commonwealth.
*Thomas J. Turner III,* for defendant.

SAVITT, *J.,* December 2, 1987 —

## FACTS AND HISTORY

On December 20, 1984 between the hours of 3:15 and 3:45 a.m. on the sidewalk in front of 1904 Carpenter Street, defendant attempted to steal the victim's purse. When she resisted defendant knocked her down, dragged her into a near-by alley where he stripped her of most of her clothing, beat and stomped her, took her money and several items from her purse and fled the scene leaving her partially clothed body covered by a trash bag.

The case was tried before this court and a jury which on June 9, 1987 returned a verdict of guilty of murder in the first degree and first degree robbery.

Following deliberation in the penalty stage the jury reported that they were unable to agree on verdict and defendant was sentenced to life imprisonment.

Post-verdict motions were timely filed in support of which defendant argues that the motion court erred in dismissing the case against defendant because of the delay between the commission of the offense and his arrest, that the trial court erred in admitting evidence of a crime other than the one for which defendant was being tried and in allowing expert testimony identifying genetic markers found in the blood on the clothing of defendant and the deceased.

## OPINION

With respect to defendant's claim that the delay between this incident and his arrest constituted a deprivation of due process, dismissal is required only when it is shown that the delay caused substantial prejudice to defendant's right to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused. *United States v. Marion,* 404 U.S. 307 (1971); *Commonwealth v. Daniels,* 480 Pa. 340, 390 A.2d 172 (1978); *Commonwealth v. Lightman,* 339 Pa. Super. 359, 489 A.2d 200 (1985). If defendant carries the burden of establishing that he was prejudiced by the delay, the goverment must present its reasons for delay. *United States v. Lovasco,* 431 U.S. 783 (1977); *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811 (1985) cert. denied, 476 U.S. 1140 (1986). It is well settled that investigative delay is fundamentally unlike delay undertaken solely to gain tactical advantage over the accused and to prosecute a defendant following such delay does not deprive him of due process, even if his defense might have been

somewhat prejudiced by the lapse of time. *United States v. Lovasco, supra, Commonwealth v. Colson, supra.*

The offense in the case at bar occurred on December 20, 1984 and defendant was arrested on July 29, 1986. At the pretrial hearing defendant testified that because of this laspe of time he was not able to remember the full names or to locate the three people who could serve as alibi witnesses on his behalf. The commonwealth introduced evidence that defendant was not arrested until July 1986 because of the difficulty the police encountered in putting together the facts, in obtaining evidence which linked the defendant to the case and in obtaining a witness to the incident. Although it is clear that defendant may have been somewhat prejudiced by this delay, it is equally clear from the record that this was investigative delay and not a delay undertaken solely to gain tactical advantage over defendant. Defendant was not deprived of due process and he is not entitled to a new trial on this basis.

Defendant's claim that the court erred in admitting evidence of a crime other than the one for which he was being tried has no merit. Although, generally, evidence of the commission of other crimes is not admissible, such evidence is admissible when there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. *Commonwealth v. Banks,* 513 Pa. 318, 521 A.2d 1 (1987), cert. denied 108 S. Ct. 211 (1987); *Commonwealth v. Buehl,* 510 Pa. 363, 508 A.2d 1167 (1986). Furthermore, the fact that a criminal event occurred subsequent to the crime for which defendant is being tried does not preclude introduction of the evidence. *Commonwealth v. Clay-*

*ton,* 506 Pa. 24, 483 A.2d 1345 (1984), cert. denied 108 S. Ct. 1098 (1988).

Here, there can be no doubt that the circumstances of the subsequent robbery, which was committed less than three hours after the instant offense and within six blocks of it, were so similar to those of the instant offense that proof of the subsequent offense tended to show that defendant was the person who committed the instant offense. Furthermore, the court instructed the jury that the evidence of the other robbery committed by defendant was admitted for a limited purpose only, as tending to show a common plan, scheme or design, and that the evidence could not be considered as showing that defendant was a person of bad character or criminal tendencies. The evidence of the subsequent robbery of Mrs. Henry was properly admitted and defendant is not entitled to a new trial on this basis.

Finally, defendant argues that the expert testimony of FBI agent Randall Murch, pertaining to the identification of genetic markers found in the blood on the clothing of defendant and the victim based on electrophoresis of dried bloodstains, was improperly admitted.

This court's research has disclosed no reported Pennsylvania cases pertaining to the admissibility of expert opinion based on electrophoresis of dried bloodstains. The general test for determining the admissibility of expert opinion based on a new scientific technique was first enunciated in *Frye v. United States,* 54 App. D.C. 46, 293 F. 1013 (1923) and adopted by the Pennsylvania Supreme Court in *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977). The test to be applied is whether the technique on which the expert's opinion is based is sufficiently established to have gained general accept-

ance in the particular field where it belongs. *Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981); *Commonwealth v. Topa, supra.*

Electrophoresis is a physical method for the separation of biologically important proteins through the use of electric current. Blood proteins vary in size, shape, density and charge; consequently they vary in electrophoretic mobility. Therefore, after electrophoresis they are separated in distinct bands on the supporting medium. The distinct bands form characteristic patterns that reveal the protein subtypes or genetic markers.[*] The specific issue here is whether electrophoresis of dried bloodstains has been shown to be sufficiently reliable to have gained general acceptance in the field to which it belongs. Because this is an issue of first impression in Pennsylvania this court has looked for guidance to other jurisdictions which have applied the *Frye* test in determining the admissibility of expert opinion based on the electrophoresis of dried bloodstains.

With respect to the field to which a given technique belongs, other jurisdictions have found that the identity of the relevant scientific community depends on the particular technique and should include those members of the scientific community whose scientific background and training are sufficient to allow them to comprehend and understand the process and form a judgment about it. *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978); *Robinson v. State,* 47 Md. App. 558, 425 A.2d 211 (1981). A scientific opinion may be accepted as evidence when the basis of that opinion is shown to be generally accepted within the expert's particular scientif-

[*] Grunbaum, "Potential and limitations of forensic blood analysis," in *Handbook for Forensic Individualization of Human Blood and Bloodstains.*

ic field and the proponent of that evidence need not show its acceptance in a broader scientific community. *Reed v. State, supra;* see also, *Commonwealth v. Lykus,* 367 Mass. 191, 327 N.E.2d 671 (1975). The scientific community relevant to the determination of the reliability of electrophoresis of dried bloodstains thus, consists of forensic scientists who use the techniques. *State v. Washington,* 229 Kan. 47, 622 P.2d 986 (1981); *Smith v. State,* 62 Md. App. 627, 490 A.2d 1307 (1985); see also, *People v. Borcsok,* 114 Misc.2d 810, 452 N.Y.2d 814 (1982). Thus, expert testimony based on the electrophoresis of dried bloodstains has been held admissible where it was shown that the technique is generally accepted as reliable among forensic scientists familiar with the technique. *State v. Washington, supra; Smith v. State, supra, People v. Borcsok, supra.* Defendant cites *People v. Young,* 425 Mich. 470, 391 N.W.2d 270 (1986) for the proposition that the relevant scientific community should be broadened to include non-forensic scientists, that this community does not accept the electrophoresis of dried bloodstains as reliable and that the expert testimony based on that technique should not therefore, have been admitted in the case at bar. This court rejects the position taken by the Michigan Supreme Court in *People v. Young, supra,* and accepts the position taken by the courts in Kanasas, Maryland and New York which have held such expert testimony to be admissible based on its general acceptance as reliable among forensic scientists.

In the case at bar Federal Bureau of Investigation Agent Randall Murch testified that using electrophoresis of dried bloodstains, the genetic markers in both defendant's and victim's blood were typed, that the victim's blood was found to contain the genetic factor GC1Y, while defendant's blood did not, that genetic factor GC1Y is found in only

two and one-half percent of the black population and that it was found on the pair of pants that defendant was wearing the night of the incident.

Before receiving testimony concerning the genetic markers, the court held a hearing in order to determine the question of admissibility. At this hearing agent Murch was first qualified as an expert in forensic serology on the basis of his advanced degrees in biological science, his additional training and his experience in forensic serology.

Having been qualified, Agent Murch testified as to the reliability of the electrophoretic technique noting that based on published scientific studies on electrophoresis of dried bloodstains and on his own experience in the field, electrophoresis of dried bloodstains is generally accepted as reliable among experts in the field of forensic serology. Agent Murch's testimony was uncontroverted. No expert witness was called by the defense nor was any evidence introduced to show that electrophoresis is either experimental or controversial. The questions concerning the degradation of dried blood and the effect of crime scene contaminants raised by defendant on cross-examination were answered by Agent Murch's testimony that there is no scientific evidence that the genetic markers in question deteriorate over time and that crime scene contaminants do not change genetic markers from one to another.

Agent Murch's testimony on the electrophoretic technique at issue plainly established an adequate foundation for his opinion and this court's ruling that the technique is generally accepted as reliable in the field in which it belongs. The testimony was properly admitted and defendant is not entiled to a new trial on this basis.

For the reasons set forth above, defendant's motion for a new trial and in arrest of judgment is denied.