THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v LUIS MARIN, Also Known as PEDRO DAVILA, Respondent.

Second Department, May 29, 1984

#### APPEARANCES OF COUNSEL

*Carl A. Vergari, District Attorney* (*Anthony Joseph Servino* of counsel), for appellant.

*J. Radley Herold* (*Howard L. Dryer* on the brief), for respondent.

#### OPINION OF THE COURT

MOLLEN, P. J.

On December 4, 1980, a conflagration at the Stouffer's Inn of Westchester claimed the lives of 26 people. Defendant, Luis Marin, was subsequently indicted, tried and found guilty by a jury of murder in the second degree (26

counts) and arson in the fourth degree in connection with the tragedy. That verdict was set aside by the Trial Judge and the indictment was dismissed. The issue on this appeal is whether the evidence presented at trial was legally sufficient to prove that the defendant had intentionally caused the fatal fire.

At the outset, the procedural posture in which the case reaches this court should be noted. At the close of the prosecution's case, and again at the close of the evidence, the defendant moved for a trial order of dismissal (see CPL 290.10, subd 1, par [a]). In effect, he argued that, because the evidence in its entirety was so weak and lacking in probative value, the Trial Judge should dismiss the case outright rather than submit it for consideration by the jury. Although the Judge expressed full agreement with the defense's position on the deficiency of the evidence, he reserved decision on the motion and permitted the jury to consider the charges. In doing so, the Judge was seeking to preserve the prosecution's right to appellate review. Where, after the taking of evidence, a Trial Judge dismisses a case without submitting it to the jury, principles of double jeopardy bar the prosecutor from pursuing an appeal from the dismissal (see *People v Brown,* 40 NY2d 381, cert den 433 US 913). In such circumstances, the case, whether rightly or wrongly, is resolved in the defendant's favor for all time. Where, on the other hand, a Trial Judge dismisses a case after the jury has returned a guilty verdict, as the Judge did here, the prosecutor's right to appeal is preserved. If he is successful, the verdict is simply reinstated with no double jeopardy implications (see *People v Leach,* 57 AD2d 332, 334, affd 46 NY2d 821). Thus, the practice of reserving decision on a motion to dismiss until such time as the jury returns a guilty verdict is entirely appropriate (see *People v Key,* 45 NY2d 111, 120; *People v Leach, supra,* p 335).*

Mindful of these considerations, the Trial Judge in this case, after assessing the evidence, submitted the charges to the jurors "fully expect[ing] that the jury would dismiss the

---

* This procedure has now been codified by the Legislature (see CPL 290.10, subd 1, par [b], eff May 31, 1983).

case". Nevertheless, after some five days of deliberations, the jury returned a guilty verdict and the Judge was then called upon to decide the motion to dismiss. He ultimately granted the motion, finding the evidence legally insufficient to sustain the verdict. In doing so, he expressed the belief that the jury had been led to its determination by the trial prosecutor's summation which, although "brilliant", had persuaded the jurors "to go beyond the proven facts". Indeed, the Judge stated that, were he not dismissing the case for evidentiary insufficiency, he would have declared a mistrial based upon the prosecutor's summation.

We need not speculate as to the reasons for the jury's verdict, or pass upon the propriety of the prosecutor's summation, for, after a painstaking review of this lengthy record, we are in agreement with the Trial Judge's assessment that the evidence was insufficient to prove the defendant's guilt beyond a reasonable doubt.

At trial, the prosecution called many witnesses including hotel employees, persons who were attending conferences at the hotel on the day of the fire, arson investigators, scientific experts and firemen who responded to the scene. Notwithstanding all this testimony, however, the People never directly connected the defendant, Luis Marin, with the fire itself or with the means to start it and never firmly established how the Stouffer's fire had actually begun.

On December 4, 1980, Stouffer's Inn consisted of three wings of guest rooms, a "Mansion" and the main building otherwise known as the conference center. The three guest room wings and "Mansion" were connected to the conference center by covered walkway type bridges. The conference center was a three-story structure, and access to any of the individual floors could be had from the ground level. The third or upper level, where the fire occurred, consisted of a banquet kitchen and several rooms which were used primarily for meetings, banquets, and receptions. Several groups and corporations were using these rooms for meetings and seminars when the fire started. The layout of the upper level of the conference center is represented below:

STOUFFER'S WESTCHESTER INN
HARRISON, N.Y.

THIRD FLOOR

SCALE 1"·30'

In relevant part, the evidence presented at trial was as follows.

On the morning of the fire, the Jaimison Room was unoccupied. Some 35 to 40 people were in the Wilson Room attending a United States Brewers Company seminar. Executives of the Nestle Corporation were meeting in the Disbrow "A" Room. Eleven General Foods employees were meeting in the Harrison Room. Betty Jane Scheihing of the Arrow Electronics Corporation was alone in the Nichols "B" Room preparing for a presentation scheduled for later that afternoon. Pepsico officials were meeting in the Disbrow "B" Room and executives of Arrow Electronics were meeting in the Haight Room.

The defendant, Luis Marin, was a Stouffer's employee whose duties included preparing coffee at designated "coffee stations" for those attending meetings in the conference center. Marin was an illegal alien from Guatemala. He had obtained his job at Stouffer's by using forged papers which identified him as Pedro Davila of Puerto Rico. Some three weeks before the fire, he revealed to his direct supervisor, Silverio Ferreira, that he was an illegal alien. He said that he was trying to legalize his immigration status and, to that end, he asked for a supporting letter from his employer. Ferreira declined to provide the letter. He explained that Stouffer's policy required that illegal aliens be discharged from employment. Any letter from Ferreira would be an acknowledgment that he knew of Marin's illegal status.

On December 3, 1980, the day before the fire, Marin asked Ferreira if he were going to be fired. At first, Ferreira replied that he was awaiting an answer to that question from his own supervisor. Later that day, however, Ferreira told Marin that he would have to be fired after New Year's Day. Nevertheless, Ferreira assured him that he would try to rehire him two or three months later under his true name.

On the day of the fire, Ferreira's schedule listed the Nestle's conference in the Disbrow "A" Room as "VIP" because Stouffer's is a Nestle subsidiary. As "coffee host", Marin had access to Ferreira's conference schedule. Notwithstanding the "VIP" designation for Nestle, however,

Marin placed a dirty coffee urn at the coffee station outside the Disbrow "A" Room, and Ferreira reprimanded him for it.

In his capacity as coffee host, Marin worked with "handy fuel" and cans of sterno which were stocked in the Stouffer's kitchen. The sterno was generally placed under the coffee urns at the stations to keep the coffee warm. Ferreira testified that the sterno cans were never lit while the urns were being transported from one place to another. Another Stouffer's employee, houseman Alex Pastor, testified that, on the morning in question, he saw Marin wheeling a cart through the Jaimison Room to the Common Hallway. The cart had a coffee urn on it, but Pastor saw no lighted sterno can on the cart. However, Richard Hamilton, who was attending the Nestle's conference, testified that sometime after 9:00 A.M. he saw a hotel employee remove a coffee urn from the coffee station outside the Disbrow "A" Room without extinguishing the sterno can underneath it.

At approximately 10:00 A.M., lobby hostess Wendy Ann Motta saw Marin turn the corner from the Common Hallway to the Haight Hallway. He was slumped over, had his hands in his pockets and appeared to be very depressed. Thereafter, Alex Pastor saw Marin in the Jefferson Room of the "Mansion" eating something. Marin then walked out.

Marin returned to the conference center and, sometime after 10:00 A.M., banquet captain Joe Romero saw him in the kitchen. Marin was filling two coffee urns and then told Romero that he needed some sodas for coffee breaks. Romero opened the liquor room adjoining the kitchen and Marin went inside and took some cartons of quart-sized soda bottles. He left and walked in the direction of the Jaimison Room.

Some five or six minutes later, Romero heard someone yell "fire" in the Common Hallway. He opened the back door to the Jaimison Room and saw smoke seeping into the room through the doors to the Common Hallway. Romero testified that he saw Marin's cart, with a coffee urn on it, standing unattended "[a]lmost close" to the doors to the Common Hallway. According to Romero, the cart was

positioned the "[l]ong way". Romero left the Jaimison Room and tried to escape through the hallway leading to the receiving and loading dock. Heavy smoke blocked his way, and he retreated and ultimately escaped through the kitchen and across the walkway to the Mansion.

Marin was next seen by Alex Pastor outside, under the walkway between the conference center and the Mansion. Pastor described the defendant as having had "smoke" on his face, hands and clothes, and a scrape on his knee. Defendant was helping another person with "smoke" on him. Marin was crying, and Pastor heard him say, "I never saw anything like this".

In an attempt to fix the precise time of the fire, Stouffer's switchboard operator, Kathleen Mary Alexander, testified that the fire alarm went off at 10:17 A.M. Wayne Landon Harbor, who was attending the Pepsico conference, testified that he had made a telephone call to Tennessee and had returned to the Disbrow "B" Room through the Common and Haight Hallways, observing nothing amiss. His telephone bill indicated that the call had been made at 10:13 A.M. and ended at 10:16 A.M. Some five minutes after his return, Harbor saw people running down the Haight Hallway, and saw smoke coming from the ceiling between the Disbrow "A" and Disbrow "B" Rooms. When he tried to open the door to the Haight Hallway, it buckled. Harbor and his five Pepsico associates then made their escape through the kitchen.

Betty Jane Scheihing, alone in the Nichols "B" Room, smelled smoke at about 10:15 A.M. and saw pale gray smoke around the ceiling. She went out into the hall and saw what she described as a "barn fire", five feet high and five feet wide. She determined that there was sufficient room for her to escape around the fire, and she heard a male voice say "come on, get out, come on". Ms. Scheihing hesitated for a few seconds, wondering whether she could retrieve her papers. In that brief moment, the fire spread so rapidly that she realized she could no longer escape to the left of the fire and had to run along the right side of the Common Hallway. By the time she reached the stairway, the fire at the intersection of the Common and Haight Hallways extended from floor to ceiling and from wall to wall. The smoke had turned dark.

At approximately 10:20 A.M., Thomas Goodrum, who was attending the General Foods conference in the Harrison Room, heard "a noise * * * that sounded like a cart or a bunch of carts being pushed very hurriedly. A tiny vibration type noise". Some 30 seconds later, he heard a female voice scream "Oh, my God", and someone pointed to smoke coming into the Harrison Room from the top of the hallway door. Charles Csaszar, also attending the General Foods conference, opened the door of the Harrison Room and saw the hallway filled with smoke. Using a conference table as a battering ram, the 11 occupants of the Harrison Room managed to break through a window and jump in relative safety to the ground below.

Raj Sabanayagan, an employee of Arrow Electronics, left his room at 10:12 A.M. to deliver a message to a fellow employee at the conference center. As he reached the top of the stairs in the center and looked through the Common Hallway, he saw a fire at the other end, some three or four feet high. A chemical engineer, Sabanayagan noticed that the fire was "clean", a "thin fire", indicating that there was "a lot of fuel source in it". At first, he thought that the blaze was in a fireplace, and he had the "impression" that someone was stoking it. Sabanayagan turned, shouted to the bellman, and returned to the top of the staircase. He noticed that the fire had grown, now reaching six to eight feet in height. It was also not as "clean", having turned yellow in color. Sabanayagan went downstairs and then returned accompanied by Wesley Sagawa, a fellow Arrow employee. Sagawa observed smoke coming from the ceiling and Sabanayagan saw that the smoke had reached the door to the Jaimison Room. Both men then retreated to make their escape.

At about 10:15 A.M., Ann Marie Vogt, attending the United States Brewers Company seminar, heard noises in the hallway and saw smoke. Her companion in the Wilson Room, Judith Taparowsky, heard a male voice say, "get out, get out". Ms. Vogt opened the door to the Common Hallway and saw heavy smoke and rapidly approaching flames. Describing the fire, Ms. Vogt testified that "[i]t was almost like a whirlwind type, tornado type of affect [sic]". A professional chemist, Ms. Vogt testified that the smoke was of a "toxic" nature, and smelled like benzine.

Bruce Hackstaff, who was leading the United States Brewers Company seminar, testified that it was approximately 10:20 A.M. when Ms. Vogt announced "fire, everyone out". As he exited through the back door, Hackstaff had to push a cart aside. When he ran down the hallway adjoining the kitchen, he glanced into the Jaimison Room and saw a cart standing crosswise across the doors to the Common Hallway. The cart had a coffee urn on it with a can of sterno burning underneath.

At between 10:20 A.M. and 10:25 A.M., Samuel Blair, who was attending the Nestle's conference, saw fire and smoke when a colleague in the Disbrow "A" Room opened the door to the Common Hallway. As Blair escaped down the Haight Hallway, he observed a river of fire overhead.

Silverio Ferreira first realized that there was a fire at approximately 10:20 A.M., when he heard what sounded like an argument in the Common Hallway. Ferreira tried to run down the Common Hallway, but something hit his legs. He then ran through the Jaimison Room and to the front desk where he directed that the alarm be sounded.

Members of volunteer fire departments began arriving at the scene at between 10:20 A.M. and 10:25 A.M. Within 30 minutes, the fire was under control. Firemen discovered charred bodies in the Common Hallway and in the Disbrow "A" Room. Bodies covered with soot were also found in the Haight Room which, when the firemen arrived, was still as hot as "an oven" and filled with smoke.

Some 20 days after the fire, as the scene was still being examined for evidence, Police Officer John Armisto came across a 10-ounce Schwepps soda bottle in the hallway behind the Wilson Room. The floor underneath the bottle, and the underside of the bottle itself, were free of soot, indicating that the bottle had been in that position before the hallway suffered the effects of the fire. Chromatography established that the bottle contained a residue of a combination of gasoline and handy fuel. The coffee urn outside the Disbrow "A" Room was discovered essentially intact. A collapsed silver-plated metal pitcher was found nearby.

Joseph A. Butler, an arson investigator employed by the District Attorney's office, pinpointed the origin of the fire at the middle of the corridor at the intersection of the Haight and Common Hallways. In Butler's opinion, a fire of the magnitude described would require at least a quart of flammable liquid. Neither the combustible materials in the hallway nor handy fuel or sterno would be sufficient to cause the Stouffer's fire. Butler acknowledged that both the 3-M Scotchguard, used to treat the carpet, and the Killmaster II, used to exterminate vermin, were combustible. Additional scientific tests revealed the presence of unidentified "volatiles" in the carpet. An examination of samples of the concrete floor underneath the carpet failed to disclose evidence of any accelerant.

In the aftermath of the fire, defendant Marin gave varying accounts of his own whereabouts and conduct at the times in question. The People placed great significance on the inconsistencies in Marin's statements. For the most part, however, those inconsistencies concerned Marin's false and later recanted claims that he had courageously tried to assist people in escaping from the inferno. None of Marin's statements either directly or indirectly constituted an acknowledgment that he had set the fire.

Defendant told television reporters that he had been in the "Common" when the fire broke out and claimed that he had helped people escape through a window in the Harrison Room. Alex Pastor testified that he heard Marin say that, as he was pushing his cart through the Jaimison Room, he realized that there was a fire in the Common Hallway. Marin said he ran into the Harrison Room, broke the window and, after telling people to follow him, jumped out.

Later, on the evening following the fire, Marin was interviewed at home by Detective Richard Smethurst. At that interview, Marin said that, as he was walking through the Jaimison Room, he detected an odor and heard what sounded like a muffled explosion. He opened the doors to the Common Hallway and ran to the intersection of the Common and Haight Hallways where he saw someone outside the Harrison Room calling for help. Marin told the person to escape through the window, although he did

not assist him in doing so because it was every man for himself. Marin ran down the Haight Hallway and escaped through the loading and receiving dock. Once outside, he helped break the fall of people who were jumping from the window of the Harrison Room.

On December 5, 1980, Marin and other Stouffer's employees were interviewed by Deputy Police Commissioner Carl Fulgenzi in a room at the hotel. On this occasion, Marin said that, at 10 o'clock on the morning of the fire he had set up coffee for the Disbrow "A" Room. Thereafter, he came through the Jaimison Room with coffee for those attending a conference in the Wilson Room. Suddenly, he heard a bang or loud noise and opened the doors to the Common Hallway. He saw smoke billowing from the ceiling. Marin then ran past the Harrison Room, telling people to escape through the window. He ran down the Haight Hallway to the loading dock. He recalled that the smoke was black in color and smelled like plastic or vinyl.

On December 13, 1980, Marin went to the hospital where his supervisor, Silverio Ferreira, was recovering from smoke inhalation. While visiting Ferreira, Marin spoke of the fire. He told Ferreira that he had gone through the Jaimison Room, and that he had escaped through the loading and receiving dock after having seen the fire in the Common Hallway and having run down that Hallway to the Haight Hallway. Ferreira expressed disbelief at this account since, in his opinion, no one could have survived in the Common and Haight Hallways. Confronted with Ferreira's skepticism, Marin admitted that his version was untrue. He said that, in fact, when he had opened the Jaimison Room doors and had seen the fire, he had run back the way he had come, through the Jaimison Room, down the hallway adjoining the kitchen, and off the loading and receiving dock. Marin told Ferreira that he had lied because "sometime you just try to be a hero".

On December 15, 1980, Marin was again interrogated at Stouffer's by Deputy Police Commissioner Carl Fulgenzi. Marin agreed that he had had access to the schedule for coffee breaks on the day of the fire which showed that Nestle's executives were meeting in the Disbrow "A" Room. Marin conceded that, when he saw fire in the

Common Hallway, he ran back through the Jaimison Room and escaped through the kitchen area. He acknowledged that he had warned no one. Although he attempted to justify his actions by pointing to his singed hair, he said that he felt guilty about the fire.

On January 16, 1981, Marin was interviewed yet again by Deputy Police Commissioner Fulgenzi who now advised him of his constitutional (*Miranda*) rights (384 US 436). Marin again acknowledged that he did not warn anyone of the fire. He stated further that, at approximately 10 o'clock on the morning of the fire, as he was setting up the coffee urn at the coffee station next to the Disbrow "A" Room, he dropped a lighted can of sterno. The carpet started to burn in scattered spots, and Marin "stomped" out the fire with his feet. He then went to the Mansion to "shoot the breeze" with Alex Pastor and others. He returned shortly thereafter to the conference center and picked up soda from Joe Romero for the coffee break at the Wilson Room. Marin loaded his cart with the soda, discarded the box, and then proceeded into the Jaimison Room. He opened the door to the Common Hallway, saw black smoke, heard people yelling, and ran out the back way to the loading and receiving dock. Shown the 10-ounce Schwepps bottle which contained residue of gasoline, Marin smelled its contents and said, "you're not accusing me of this. I didn't use this".

Marin was then asked to accompany police to the conference center in order to retrace his movements. Lieutenant Richard Riguzzi timed him and found that it took only 18 seconds to walk through the Jaimison Room. When Marin opened the door from the Jaimison Room to the Common Hallway, he hit the "crash bar" which made a metallic sound.

Marin told Lieutenant Riguzzi that he had not mentioned his accident with the sterno in prior interviews because he felt responsible for the fire. But when Riguzzi accused him of having set the fire intentionally, Marin denied it and started to cry.

Wilson J. Morales, an investigator with the District Attorney's office, testified that, acting in an undercover capacity, he had attempted to elicit additional information from Marin. In early January, 1981, he befriended Marin

in the Las Marguerita's Bar. On January 7, he took him for a ride past the Stouffer's Inn. Marin said that it was a "nice hotel" which had suffered a terrible fire. Marin told Morales that he had made a mistake with one of the sterno cans and that the police suspected him of having started the fire because "[he] was the only one that worked with fire".

On January 12, 1981, Morales had another conversation with Marin, and offered him a job. Marin refused the offer, saying "I can't get involved in anything now, I'm too hot. If I get caught in anything else, it's going to get worse." When Morales asked how so many people could have died in one fire, Marin replied, "Brother, it was a flash." Morales then asked whether there were any witnesses who could testify for Marin. Marin began his reply by recounting his movements on the morning of the fire. He said that he dropped off one cart in the kitchen at 10:10 A.M. and picked up another one. He pushed that cart through the empty Jaimison Room and kicked open the door to the Common Hallway. He heard people screaming and yelled "[g]et out". He then left the way he had come, through the Jaimison Room. He said that nobody had seen him.

At trial, several witnesses testified that they had seen no evidence of an accident on the carpet during the period from 10:00 A.M. until the fire started.

Alex Pastor also testified that, approximately two months before the fire, Marin's car had run out of gasoline. Marin had a siphon and container in his trunk, and Pastor accompanied him to a gas station where Marin had the container filled with gasoline for his car.

As previously noted, based on this evidence, the jury found defendant guilty of murder in the second degree (26 counts) and arson in the fourth degree. Concluding that the evidence was not legally sufficient the trial court set the guilty verdicts aside.

We begin our analysis by noting that the People's case was based solely on circumstantial evidence. Notwithstanding the People's assertions to the contrary, defendant's statements do not qualify as direct or "eyewitness testimony" (see *People v Lipsky,* 57 NY2d 560, 570; *People v Licitra,* 47 NY2d 554, 558-559; *People v Bretagna,* 298 NY

323, 326, cert den 336 US 919), since he neither confessed to the crimes nor admitted, explicitly or implicitly, any of the facts necessary to establish his commission of the crimes (see *People v Sanchez,* 61 NY2d 1022; *People v Benzinger,* 36 NY2d 29; *People v Leach,* 57 AD2d 332, 337-339, *supra; cf. People v Rumble,* 45 NY2d 879, 880; *People v Licitra, supra*). False statements such as those made by defendant may constitute circumstantial evidence of a consciousness of guilt from which a defendant's guilt may be inferred (Richardson, Evidence [Prince, 10th ed], § 167; see *People v Benzinger, supra*). Standing alone, however, evidence of consciousness of guilt is not sufficient to convict; it may only be used "to strengthen 'other and more tangible evidence' of guilt" (Richardson, Evidence, *op. cit.,* p 134).

The rules governing circumstantial evidence are well settled. As we stated in *People v Leach* (*supra,* pp 336-337): "In *People v Benzinger* (36 NY2d 29, 32), the Court of Appeals had recent occasion to consider the question of the quantum of circumstantial evidence necessary to sustain a conviction, and summarized its prior holdings on the subject as follows: 'The oft-stated rule with respect to convictions based exclusively on circumstantial evidence is that for guilt to be proven beyond a reasonable doubt the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them; and the facts proved must exclude "to a moral certainty" every reasonable hypothesis of innocence * * * The reason for the current application of this rule is not that circumstantial evidence is thought to be weaker than direct evidence, since the reverse is frequently true. Rather the rule draws attention to the fact that proof by circumstantial evidence may require careful reasoning by the trier of facts. By highlighting this aspect, the rule hopefully forecloses a danger legitimately associated with circumstantial evidence — that the trier of facts may leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree * * * In the end the application of the test becomes "a question of whether common human experience would lead a reasonable man, putting his mind to it, to reject or accept the inferences asserted for the estab-

lished facts" * * *' Since the issue here is one of the suffi-
ciency of the circumstantial evidence, we view the facts
most favorably to the People, and assume that the jury
credited the prosecution's witnesses and gave to their
testimony the full weight that it might reasonably be
accorded" (accord *People v Way,* 59 NY2d 361, 365).

Applying these principles to the case at bar, we agree
with the trial court's conclusion that the evidence was
insufficient to sustain the convictions.

It is true that defendant, having been present in the
conference center at the time in question, had an opportu-
nity to set the fire. However, as the trial court noted, the
conference center was a public place "with hundreds of
people moving freely about". Countless other persons,
therefore, including guests, other employees and members
of the general public, also had an opportunity to set the fire
for reasons known only to themselves.

The fact that one of the People's witnesses heard what
"sounded like a cart or a bunch of carts being pushed very
hurriedly * * * [a] tiny vibration type noise" did not connect
defendant with the fire. The People did not contend at trial
that the defendant's cart was the only one in the conference
center, and, indeed, adduced evidence that there was at
least one other cart, behind the Wilson Room. Moreover,
the doors from the Jaimison Room to the "Common" Hall-
way were equipped with a "crash bar" which made a
metallic noise when opened.

On the question of motive, the People theorized that,
upon learning that his job was to be terminated in less
than a month, and after having been reprimanded on
account of a dirty coffee urn, Marin decided to set a fire so
that he could become a hero and ingratiate himself to his
employers. The People further proposed that Marin chose
to set the fire in front of the Disbrow "A" Room because
executives of the Nestle Corporation, Stouffer's parent
company, were meeting there.

Marin's "heroic" claims were first made in the flush of
excitement immediately following the fire. They were
transparently false and easily disproved since no one who
escaped the fire would credit Marin with having rendered
any assistance. Marin readily withdrew his claims when

confronted by Ferreira, saying "sometime you just try to be a hero" — an observation upon which the prosecution's entire "hero" motive theory seemed to hinge. It is apparent that Marin sought to gain some advantage out of the tragedy by making false boasts of bravery to fellow employees, investigators and the press. It seems equally apparent from his subsequent statements that in fact he felt "guilty" about having fled the scene without warning or helping anyone else. It does not follow, however, that he had formulated in advance a plan to become a hero by rescuing people from a fire he himself would set.

Moreover, as to Marin's impending discharge, it is significant that he was told that it was purely a matter of policy and that attempts would be made to rehire him within a matter of only a few months. Finally, and of great relevance to the People's theory on this point, there was no evidence whatsoever that Marin knew that Stouffer's was in fact owned by the Nestle Corporation. Thus, it can hardly be said that the prosecution established a strong motive for Marin to have set the fire.

The People also laid great stress on Marin's statement to the police that he had accidentally caused small fires by spilling a can of sterno — fires which, he said, he immediately extinguished. This account, the prosecution contended, was shown to be false by the testimony of several witnesses who had not noticed any spots on the carpet. Marin's "lie", the People claimed, demonstrated his consciousness of guilt.

The testimony relied on by the People, however, established not that Marin had lied about the accident, but only that he had not caused damage to the carpet which would be obvious to a casual passerby. Moreover, even if Marin did lie, it hardly follows that his account demonstrated a consciousness of guilt for having later intentionally started the fatal fire.

Nor do defendant's statements provide the necessary connection between defendant and the fire. Contrary to the People's contention, defendant's statement that the fire was a "flash" did not indicate any special knowledge of its origins. Such a statement is unremarkable in that the fire was a "flashfire" which consumed 26 lives in a matter of

minutes. Defendant's other statements only established that he fled from the fire, made no attempt to rescue anybody and subsequently lied. These statements suggest a consciousness of guilt, but not necessarily about the crimes charged. As previously noted, evidence that defendant made false statements, standing alone, is not sufficient to convict (see, also, *People v Leyra,* 1 NY2d 199, 208-211; *People v Santos,* 90 AD2d 982).

The People also found portions of Joe Romero's testimony highly significant. He claimed to have heard someone yell "fire" some five or six minutes after Marin picked up soda bottles from the liquor room. Other testimony established that it would have taken Marin only 18 seconds to walk through the Jaimison Room, and the prosecution proposed that he had used the remainder of the time to start the fire. It is likely, however, that the fire began well before Romero first heard the cry. Moreover, the time differential was not as great as it seemed, as it failed to allow for the time it undoubtedly took Marin to remove the soda bottles from the cartons and load them onto his cart. In addition, Marin stated that, upon seeing the smoke and fire, he immediately ran back through the Jaimison Room and escaped to the loading and receiving dock, all without warning Romero or the kitchen workers. Romero testified that, when he heard the cry of "fire", he, too, tried to escape to the loading and receiving dock but his way was blocked by impenetrable smoke. It would seem to follow, then, that Marin was long gone by the time Romero first heard the warning.

It is arguably true that some of these questions arising from the evidence were properly matters for the jury to ponder. The crucial evidence, however, related to the People's theory as to Marin's alleged opportunity to start the fire, the manner in which he did so, and the means that were available to him. Careful examination of the record reveals that the evidence on these points was so speculative and conjectural as not to merit jury consideration.

As previously noted, the center was essentially open to the public and had many occupants at the time the fire started. Any one of them, or indeed someone coming in

from the outside, could well have had the same opportunity to commit the arson, if arson it was.

More important is the glaring weakness of the evidence underlying the prosecution's theory as to the way Marin allegedly set the fire. There was no testimony that anyone saw Marin actually start the fire. It is true that Marin worked with fire fueled by cans of sterno. The prosecution's own arson expert, however, testified that sterno could not have caused the Stouffer's fire, and the People never claimed otherwise. Instead, the prosecution theorized that Marin left the conference center to get gasoline either from his car or from the Mansion. He then returned, carrying the gasoline in the 10-ounce Schwepps bottle. He set up his cart, took soda bottles from the liquor room, poured the gasoline into the silver-plated water pitcher, walked through the Jaimison Room and set the fire. The total lack of evidentiary support for this theory is undeniable.

There is not one shred of evidence linking Marin with any gasoline or other accelerant on the day of the fire. No one saw him anywhere near his car at any time after his arrival at Stouffer's that day. Indeed, there was no evidence that the siphon, seen in his car two months earlier, was still in the vehicle on the day in question.

As to the Schwepps bottle, the prosecution's own expert testified that, even if full, it could not have contained sufficient gasoline to cause a fire of the magnitude of the one at Stouffer's. Moreover, there was absolutely no evidence connecting Marin to the Schwepps bottle. No one saw him in possession of it and, although he had gotten soda bottles from the liquor room, the uncontradicted testimony was that Stouffer's stocked only quart-sized bottles. As to the silver-plated water pitcher, again there was absolutely no evidence connecting Marin to it. Indeed, there was no evidence even suggesting that the pitcher had ever contained gasoline or any other accelerant.

Given the totality of the trial evidence, we conclude — as did the Trial Judge — that the People did not adduce the quantum of circumstantial evidence necessary to convict. The hypothesis of defendant's guilt does not flow naturally from the facts proved. The facts proved simply do not, as

required by law, exclude to a moral certainty every reasonable hypothesis of defendant's innocence of the crimes charged (see *People v Benzinger,* 36 NY2d 29, *supra; People v Leach,* 57 AD2d 332, 339, *supra; People v Mitchell,* 64 AD2d 119). As the Court of Appeals stated long ago, circumstantial evidence "is of no value if consistent with either the hypothesis of innocence or the hypothesis of guilt. It is not enough if the hypothesis of guilt will account for all the facts proven" (*People v Suffern,* 267 NY 115, 127).

In sum, careful analysis of the record discloses too much speculation and too many gaps in the People's proof to establish the defendant's guilt beyond a reasonable doubt (see *Jackson v Virginia,* 443 US 307, 315-320). The jurors in this case did precisely that which the rules governing circumstantial evidence are designed to guard against, viz.: they "leap[ed] logical gaps in the proof offered and [drew] unwarranted conclusions based on probabilities of low degree" (*People v Benzinger, supra,* p 32).

As the Supreme Court made clear in *Jackson v Virginia* (*supra,* p 316), an essential of due process (US Const, 14th Amdt) is that, "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof — defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." The court added that this rule of law, "requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. * * * A 'reasonable doubt,' at a minimum, is one based upon 'reason.' *Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt * * ** Under [*Matter of Winship,* 397 US 358], which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, *it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand.*" (*Jackson v Virginia, supra,* pp 316-318; emphasis added.)

Sensitive to the magnitude of the decision to be made in connection with the defendant's motions for a trial order of

dismissal, Trial Judge Martin stated that, "I have a sworn duty to uphold the law as I believe it to be. As a human being I have a duty to myself and my fellow man to follow my conscience. When both my understanding of the law and my conscience dictate the same decision there can be no other choice but to follow it. No matter the consequence." Having found the evidence of the defendant's guilt to be legally insufficient, the Trial Judge was obligated under the law to set aside the verdict and dismiss the indictment. Similarly, our agreement with him, after a thorough analysis of the trial record, as to the insufficiency of the evidence, requires us to affirm. A conviction simply cannot stand on the basis of jury speculation as a substitute for proof of guilt beyond a reasonable doubt (*Jackson v Virginia, supra*).

Jury verdicts are not to be set aside lightly. However, they are not sacrosanct. Under our system of law, we cannot and we do not permit a jury verdict to stand based upon speculation and conjecture.

The loss of life at the Stouffer's Inn fire was a tragedy of staggering proportion. Indeed, no words can adequately describe the enormity of the loss. However, the tragedy would be compounded by the conviction and imprisonment of a person whose criminal responsibility for that tragedy has not been proven.

Accordingly, the order granting the defendant's motions for a trial order of dismissal must be affirmed.

MANGANO, THOMPSON and BOYERS, JJ., concur.

Order of the County Court, Westchester County, dated April 14, 1982, affirmed.