■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVIE RODRIGUEZ, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Queens County (Sharpe, J.), rendered September 13, 1983, convicting him of murder in the second degree and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence. ¶ Judgment reversed, on the law, indictment dismissed and matter remitted to the Supreme Court, Queens County, for the purpose of entering an order in its discretion pursuant to CPL 160.50. ¶ The evidence presented at trial, viewed most favorably to the People, failed to establish a prima facie case against the defendant (*Jackson v Virginia,* 443 US 307, 319). ¶ Defendant was charged with aiding and abetting his codefendant Pedro Diaz in the murder of one Belarmino Mejia. Mejia was shot and killed in the basement entrance to an apartment building at about 7:00 A.M. on July 28, 1982. It was the People's theory that codefendant Diaz, upon learning that his wife Sylvia was having an affair with Mejia, enlisted the aid of the defendant to help him find and murder Mejia. At the time, defendant was the paramour of the Diaz' daughter Marilyn and the father of her child. ¶ The prosecution originally founded its case upon statements made by Sylvia Diaz and Marilyn Diaz to the police and upon their testimony before the Grand Jury to the effect that Pedro Diaz admitted killing Mejia and that defendant admitted assisting him. When it came time for trial, however, both witnesses recanted their prior statements and Sylvia Diaz affirmatively testified that on the morning of the murder her husband was at home with her until approximately 8:30 A.M. when the defendant came by in his car to drive both of them to a court appearance. While the witnesses' prior Grand Jury testimony and statements were revealed to the jury during examination by the prosecutor, after they had been declared to be hostile witnesses, this evidence constituted only impeachment evidence and was not direct evidence of the substance thereof (see CPL 60.35). The evidence-in-chief at trial came from the testimony of several witnesses to the shooting and the police officers who investigated the case. ¶ One witness testified that on the morning of the shooting, as she was getting ready to go to work, she heard five shots which she took to be firecrackers. When she looked out the window she "saw a car going by * * * very slowly — I saw the driver looking the other way that looked kind of suspicious". When asked what kind of car it was she replied, "Well, I think it was a blue car, I don't know about car names". She saw the driver, who "looked Spanish, dark complexion, not as dark as me, but lighter and curly hair. I could see his profile and he was driving slowly towards * * * the place where someone got shot". When asked to indicate whether the driver was in the courtroom, the witness got up and approached the defense table and, referring to defendant, said: "I do see some resemblance, but I could not say for sure * * * He more or less fits the description, but his hair is longer * * * I only saw his face and profile". When the prosecutor asked exactly how defendant resembled that person, the witness replied, "Well, it was that skin tone, but the person that was driving didn't have a mustache and had shorter hair * * * the person that was driving the car seemed to have more softer, curliest [*sic*] hair". Detectives Sinram and Ficken, two of the police officers who investigated the shooting, both testified, however, that when they arrived at the scene that morning, they spoke to this witness and she told them that she could not see the perpetrators' faces. According to Ficken, several other

unnamed witnesses at the scene described the getaway car variously as blue, black or maroon, and based upon this information a description of the car as a dark auto was broadcast. ¶ A second eyewitness testified that when she looked out of her window upon hearing "popping sounds * * * like firecrackers" she saw a car pulling away and caught a glimpse of the tail end of it as it turned at the end of the block. It appeared to her to be "in the family of a Monte Carlo or a Cutlass". She couldn't tell how many people were in the car. When asked on cross-examination whether she had told the police that it was "either blue or green", she replied, "I am sure I told them green". While she was certain that she told the police that the car resembled a Monte Carlo, the police report contained no such description. ¶ A third eyewitness testified that, from a half a block away, he saw a man fire two shots. He could not describe the getaway car. According to this witness, the shooter was wearing a short-sleeved blue shirt with white piping or a white shirt with blue piping, but recalled giving only the former description to the police. When the police later told him that they had recovered a white shirt with blue piping, he maintained that the shirt he observed was blue with white piping. He also testified that the shooter was firing downward toward the door of a basement entranceway on the street. ¶ Detective Angelo Garcia, another of the investigating detectives, testified that at about 9:30 on the evening of the incident he went to the home of Dulce Collado, defendant's girlfriend, and recovered a blue shirt with white piping, which had been hanging in the bathroom, and was wet. After recovering the shirt, Detective Garcia had a conversation with codefendant Diaz, during which Garcia showed him the shirt. Following this conversation, Garcia put the shirt under lock and key and subsequently vouchered it. ¶ Detective George Hess testified that he spoke with the defendant on the night of the incident and, as a result of the conversation, defendant voluntarily took him and two other officers to a parked 1975 blue Monte Carlo and opened it with his keys. ¶ Dulce Collado testified that she has known defendant for eight or nine years and that he is the father of her children. She also stated that defendant and Pedro Diaz were friends. On the morning of the incident, at 7:30 or 8:00, Diaz picked up defendant at their house, a couple of blocks from the scene of the murder, to go to court. According to Collado, defendant had a blue car. She also acknowledged that she had washed the shirt that she gave to Detective Garcia. ¶ The eyewitness who had given the description of the shooter's shirt was recalled and, over defense objection, was shown the shirt taken by the police and testified that it "look[ed] like" the shirt worn by the shooter. The witness saw the incident for about a minute and a half from a half block away. He still could not recall whether the shirt was white with blue piping or blue with white piping. ¶ Dr. Manuel Fernando testified that Mejia, the victim, died of several gunshot wounds fired at very close range which were consistent with someone shooting from atop a flight of stairs to someone at the bottom. ¶ Defendant presented no witnesses. The jury found both the defendant and the codefendant guilty of murder in the second degree and criminal possession of a weapon in the second degree. We reverse. ¶ Once the codefendant's wife and daughter recanted their prior testimony of defendant's alleged admission of participation in the murder, the People's cases became solely circumstantial. It is, of course, well established that in reviewing a conviction based solely upon circumstantial evidence of guilt, the conclusion of guilt must be consistent with and flow naturally from the proven facts, and those facts viewed as a whole must exclude, to a moral certainty, every conclusion other than guilt (*People v Kennedy*, 47 NY2d 196); *People v Marin*, 102 AD2d 14. Viewing the evidence at bar in the light most favorable to the People, it is clear that there has been a failure to establish the defendant's guilt beyond a reasonable doubt. The People's case rests solely upon the following facts: (1)

the testimony of one witness — who, it should be noted, told two detectives on the morning of the crime that she could not see the faces of the perpetrators — that defendant bore "some resemblance" to the driver of the getaway car and "more or less fits the description"; (2) evidence that defendant owned a car which generally matched the description of the getaway car; (3) evidence that a shirt similar to the one worn by the shooter was recovered from defendant's girlfriend's home on the evening of the shooting; (4) evidence that defendant was in the company of his codefendant on the morning of the shooting; and finally, (5) evidence that the codefendant, who was also not identified by any of the eyewitnesses, had a motive to murder the victim. Taken as a whole, it cannot be said that any reasonable trier of the facts could have inferred from the evidence presented that the defendant's guilt of the crimes charged was proven beyond a reasonable doubt. Accordingly, the judgment must be reversed and the indictment dismissed. ¶ In light of our determination, we do not reach any of the other issues presented. Lazer, J. P., Brown, Boyers and Eiber, JJ., concur.