OPINION OF THE COURT
Bonnie Wittner, J.
The defendants are charged with violations of New York City Zoning Resolution § 32-41 by operating an open-air flea market on the parking lot of Aqueduct Racetrack in the County of Queens, pursuant to Administrative Code of the City of New York §§ 643a-12.0, C26-87.0.
The defendants move for a dismissal of the instant accusatory instruments on the following grounds:
1) The defendants’ constitutional rights to equal protection of law under US Constitution, 14th Amendment, and NY Constitution, article I, § 11 have been violated by the city’s selective prosecution.
*784 2) Sections 32-41 and 32-22 of the New York City Zoning Resolution are unconstitutional in that they are so vaguely written and applied that they violate the defendants’ right to due process of law pursuant to US Constitution, 14th Amendment, and NY Constitution, article I, § 6.
An evidentiary hearing on the equal protection issue was ordered by Tsoucalas, J., on May 26, 1983, and this matter was assigned to this part (AP-7) on October 19, 1983 for the above-ordered hearing. The hearing began on that date and continued on October 20 and 21,1983. At the conclusion of the evidentiary hearing, both defendants and the People entered into a stipulation whereby the extensive record therein was adopted as the People’s direct case on the trial of these matters. The defendants then moved to dismiss the information at the conclusion of the People’s direct case for failure to present a prima facie case.
Thereafter on or about March 30, 1984, a conference was held by me at which the People and the defense attorneys were present. Counsel for both defendants advised the court that they would not present a defense case and would rest upon the evidence presented in support of its motions to dismiss and the evidence presented by the People on their direct case. Defendants, of course, renewed their motions to dismiss on the grounds previously raised and additionally on the ground that the People have failed to establish -guilt beyond a reasonable doubt.
The decision below not only addresses each of the issues raised by defendants in its motions but also sets forth the court’s verdict after trial.
During the course of the proceedings before me Sheldon Hills, Charles Segreto, Randy Green, Stanley Bengelsdorf, James Battaglia, Deborah McCord, Martin L. Lieberman, Julia Wager, Cynthia Blank and Roger Di Renzo testified as defense witnesses. Ann Grossberg, Carole Travers and Cornelius F. Dennis testified for the People.
FINDINGS OF FACT
Based upon all of the credible evidence adduced, I find and conclude as follows:
The New York Racing Association, Inc. (NYRA), is a nonprofit racing association incorporated within the State of New York, the stated purpose of which is to conduct racing, pari-mutuel betting, and wagering and thereby raise reasonable revenues for the State. Although NYRA is a nonprofit organization it is permitted to show an annual profit no greater than $1,850,000 but is not permitted to pay dividends to its stockholders.
*785 Statutorily, NYRA is permitted to conduct horse racing at Aqueduct Racetrack 362 days a year, but in actuality racing takes place only six days per week during seven months of the year.
At present, NYRA engages in a number of ancillary commercial endeavors. It has entered into myriad contracts, leases, and subleases which permit its facilities to be utilized not only for the flea market which is the subject of the instant violation, but also for political and religious conventions, concerts, carnivals, wine festivals, health fairs, as well as the closed circuit telecasting of prizefights and other major races.
In 1973 NYRA entered into the first of several contracts to provide for the operation of a flea market at the Aqueduct Racetrack. In 1974, the defendant Barterama, Inc., contracted to operate the flea market at Aqueduct, and has done so continuously until the present time. By the terms of its contract Barterama pays NYRA a fee for the use of the racetrack. Thus far, more than $3,000,000 in revenues for the State has been generated as a result of the aforesaid agreement between the defendants.
Pursuant to its contractual agreement with NYRA, the defendant Barterama operated the Aqueduct Flea Market on Sundays from 8:00 a.m. until 4:00 p.m. during the period from May of 1974 until mid-1976. Then in 1976, the parties agreed to operate the flea market during the same hours on Tuesdays, and in 1977, the flea market operated on Saturdays as well. At present, NYRA and Barterama operated the Aqueduct Flea Market on these three days per week between the hours of 8:00 a.m. and 4:00 p.m. during nonwinter months.
The complaint which allegedly generated the instant inspection and ultimate violation order and summons was not made by any of the merchants’ associations or their operatives, but rather by a neighboring resident of the Aqueduct Racetrack, Ms. Carol Travers.
Ms. Travers, who lives directly across the street from the Aqueduct Racetrack at 110-46 108th Street in the Ozone Park area of Queens County, had for some time been displeased by the noise, odors and dirt which the flea market’s operation and cleanup generated. In May 1980, Ms. Travers filed a complaint with Community Board No. 10 because of the alleged unsanitary conditions and health hazards caused by the inadequate cleanup following the flea market’s operation. Thereafter, on July 31, 1980 Ms. Travers again sought the assistance of her Community Board in resolving her continuing problems with *786 the flea market. As a result, the following formal complaints were filed: one with the Department of Sanitation; another with the Department of Consumer Affairs; and the instant complaint with the Department of Buildings. Although the first two agencies investigated, no formal action was taken as a result. In contrast, the Department of Buildings (the Department), without the necessity of Ms. Travers making further complaint, initiated an investigation and subsequently issued the violations which are the subjects of the instant motions.
On September 2, 1980 Buildings Department Inspector Di Renzo received a telephone call from Chief Inspector Perlmutter of the Department who advised him of Ms. Travers’ complaint. Perlmutter specifically mentioned to Di Renzo that Ms. Travers was particularly upset by children urinating on her fence and property. Perlmutter directed Di Renzo to promptly answer Ms. Travers’ complaint and make an inspection of the Aqueduct Flea Market.
Shortly thereafter Di Renzo arrived at the Aqueduct Racetrack. After interviewing Ms. Travers for approximately 15 to 20 minutes, he inspected the flea market which was operating that day. Di Renzo then returned to his office, determined that Aqueduct was in a C-8 zoning district, and examined the track’s certificate of occupancy. Di Renzo then discussed the open-air retail operation within a C-8 district with the Department’s planning examiners, and concluded that NYRA and Barterama were in violation of New York City Zoning Resolution § 32-41 and issued the instant violations.
On March 24, 1981 Inspector Di Renzo again visited the Aqueduct Racetrack. Upon observing the operation of the flea market, he issued the subject summonses to each of the named defendants herein.
Inspector Di Renzo testified that the sole basis upon which he issued the instant violation was that the flea market was engaged in open retail use within a C-8 zoning district. Di Renzo was, and still is, of the opinion that the size of the market and whether it was temporary or permanent have no effect on the application of section 32-41 to the Aqueduct" Flea Market. Di Renzo also theorized that virtually all ancillary uses engaged in by NYRA at Aqueduct constitute violations of the Zoning Resolution for engaging in activities not authorized by the certificate of occupancy. Nevertheless he did not charge any other violations nor did he issue any violations to other ancillary uses at Aqueduct at the time of his inspection.
*787 New York City Zoning Resolution § 32-41, in pertinent part, provides as follows: “Enclosure within Buildings. In the Districts indicated (C1-C6, C8), except as otherwise specifically provided in the use groups permitted in such districts and in Section 36-11 (General Provisions) and Section 36-61 (Permitted Accessory off-street Loading Berths) all permitted uses which are created by new development, or which are enlarged or extended or which result from a change of use shall be subject to the provisions of this Section with respect to enclosure within buildings. With respect to the enlargement or extension of an existing use, such provisions shall apply to the enlarged or extended portion of such use.”
It is undisputed that the Aqueduct Racetrack is located within a C-8 zoning district and has been continuously so located throughout the period of time that a flea market has been operating at the track.
Furthermore, the stipulated evidence indicates that numerous other flea markets have operated and continue to operate within the City of New York, several of which are also located within commercial zoning districts and none have ever been prosecuted for a violation of section 32-41 or the very similar section 42-41 applicable to manufacturing districts. As early as January 1980, in fact, the documentary evidence before me indicates that grave doubts existed regarding the application of the Zoning Resolution to flea markets without a clarifying amendment to the resolution’s text. At that time, Irwin Fruchtman acknowledged the uncertainty of applying the Zoning Resolution to flea markets within the City of New York. (See, Letter from Irwin Fruchtman to Herbert Sturtz, City Planning Commissioner [Jan. 21, 1980] attached to defendants’ exhibit E-4.)
Also of significance is a report compiled at the direction of Cornelius Dennis, Assistant Commissioner of the Department of Buildings. This March 21, 1983 memorandum was prepared for the benefit of the Corporation Counsel prior to the instant hearing on the defendants’ motions. Within the memo, Dennis not only indicates that no other zoning violations have been issued to the listed flea markets, but also states that certain open retail uses such as fairs, carnivals or even flea markets may operate in a C-8 zoning district.
Indeed during Dennis’ testimony before me, he indicated in answer to a hypothetical question that a violation of New York City Zoning Resolution § 32-41 would not lie based solely upon one inspection of open retail sales at a location within a C-8 district. Moreover, Dennis indicated that a complaint of children *788 urinating on an individual’s property, which prompted Perlmutter to order Di Renzo to investigate, was not even within the Department of Buildings’ jurisdiction.
CONCLUSIONS OF LAW
Points I and II (omitted for publication).
III. TRIAL ORDER OF DISMISSAL AND VERDICT
The third branch of the defendants’ motion to dismiss the informations is made pursuant to CPL 290.10.[1] This motion was originally made at the conclusion of the People’s direct case. While this matter was still under the court’s consideration, both sides agreed to rest on fhe present record. Defendants renewed their motion to dismiss.
Specifically, the defendants contend that the People have failed to provide sufficient legal evidence to establish each element of the crimes charged in the instant informations, and therefore they are entitled to a trial order of dismissal prior to the court’s rendering of a verdict.
Therefore, critical to this motion and ultimately to the question of guilt is the court’s determination of the essential elements of the crimes charged herein.
The instant informations charge defendants with violations of Administrative Code §§ 643a-12.0,[2] C26-87.0[3] and New York City Zoning Resolution § 32-41. The identical informations state, in pertinent part:
*789 “said premises are located in a residential district and the operating parking lot floor thereof was occupied for the business of parking cars — changed to open flea market * * *
“That an order was issued by said Commissioner of Buildings and the Borough Superintendent on the 2nd day of September, 1980 and served upon said defendant on the 3rd day of September, 1980, whereby said defendant was directed to discontinue said unlawful use, a copy of which order is hereto annexed and made a part continued hereof.
“That this order has not been complied with although more than 10 days since the service thereof.
“That said violation of law was committed by said defendant in the county of Queens.”
The People, citing People v Namro Holding Corp. (10 AD2d 702 [1st Dept 1960], affd 8 NY2d 1131 [1960] [Namro /]), contend the only elements necessary for the commission of the instant offenses are (1) the issuance of a notice of violation by the Department of Buildings upon the defendants, and (2) the defendants’ subsequent failure to comply therewith. The People also maintain that they are neither required to prove the propriety of the underlying notice of violation nor may the violation order be collaterally attacked or reviewed in the criminal prosecution for its noncompliance. (People v Namro Holding Corp., supra; People v Gillman, 6 AD2d 899 [2nd Dept 1958].)
The defendants urge the court to reject the Namro I doctrine. They argue that since the instant informations specifically allege violations of New York City Zoning Resolution § 32-41, the People must prove the underlying violation of section 32-41 as a material element of the charged crimes (People v Iannone, 45 NY2d 589 [1978]; People v Weinberg, 34 NY2d 429 [1974]).
The court’s determination of this issue is not only critical to the ultimate resolution of this matter, but impacts greatly upon • the fashion in which crimes set forth in the Administrative Code of the City of New York are prosecuted within the City’s Criminal Courts.
On a daily basis, this court like all other Criminal Courts within New York City is confronted with an evergrowing number of matters instituted by City agencies. Generally utilizing “fill-in-the-blank” form informations, the People charge defendants with the failure to comply with a notice of violation and specifically cite a particular section of the Administrative Code pursuant to which the original violation order was issued. It is the People’s position that in prosecutions commenced in the *790 above manner defendants may not litigate the validity of the underlying violations in Criminal Court. In other words, the People contend that once a defendant is prosecuted in Criminal Court he may not present any factual defenses to the underlying violation order.
In support of its position the People rely principally upon the previously mentioned People v Namro Holding Corp. (supra). A review of its complex history is necessary to understand the positions advanced by both sides he,re.
The First Department of the Appellate Division originally determined in People v Namro Holding Corp. (supra), that where the defendant was not charged with a violation of the substantive provisions of the Administrative Code, but merely with the failure to comply with a violation order, the propriety of the underlying notice of violation was not relevant nor should it be collaterally reviewed in the subsequent criminal prosecution. Rather, the court stated that the appropriate forum in which to challenge the validity of the violation order was before the Board of Standards and Appeals by pursuing the defendant’s administrative appeals. Justice Breitel in a very strong dissent stated that the majority’s holding was patently unconstitutional. Highlighting what appeared to be the significant due process problems presented by the majority holding, Breitel stated that the decision “reach[es] so far as to give an administrative officer power to create a misdemeanor by an unintelligible regulation. And this, merely because he orders compliance with his own direction, the validity of which is carefully screened from all but himself and his assistants.” (10 AD2d, at p 703.) Despite this powerful dissenting opinion, the defendant’s conviction was affirmed without opinion (People v Namro Holding Corp., 8 NY2d 1131 [1960], supra).
Subsequently, in Namro Holding Corp. v City of New York (17 AD2d 431 [1st Dept 1962], affd 14 NY2d 693 [1964] [Namro //]) the same defendant brought an action for a declaratory judgment challenging the validity of the underlying violation order which resulted in the misdemeanor conviction in Namro I. The Namro II court held that seeking a declaratory judgment without first exhausting all administrative appeals was indeed a proper remedy under the circumstances, and upon a review of the alleged violation found that it was in fact unfounded. A vigorous dissent argued that the majority’s opinion had completely nullified its previous decision in Namro I. Thereafter, the Court of Appeals affirmed the majority without opinion in Namro II (14 NY2d 693 [1964], supra). Therefore, the result of *791 more than four years of difficult litigation was that the Namro Holding Corporation had a criminal record, having been convicted of a misdemeanor based upon a notice of violation which was found to be improperly issued!
Thereafter, lower courts strained to apply the conflicting Namro opinions to similar criminal prosecutions. At first, courts relying primarily upon Namro I refused to review the propriety of violation orders. (People v Gutterman, 36 Misc 2d 795 [Crim Ct, Queens County 1962]; People v Looe, 51 Misc 2d 835 [Crim Ct, Municipal Term, Queens County 1966].) However, courts, obviously uncomfortable with the People’s selection of a forum so as to preclude review of the propriety of violation orders, considered the defendants’ unenviable position as a mitigating factor or sentenced the defendants to nominal fines. (See, e.g., People v Feinberg, 48 Misc 2d 187, 189 [Crim Ct, Bronx County 1965]; People v Looe, supra, at p 839.)
It is well documented that in the 1960’s and 1970’s courts expanded defendants’ constitutional rights, particularly those based upon concepts of procedural and substantive due process. Recognizing the expansion of defendants’ due process rights, this City’s Criminal Courts struggled to apply, or more accurately, to avoid the Namro I doctrine.
Illustrative of these decisions is People v Cedar Mgt. Corp. (83 Misc 2d 860 [Crim Ct, NY County 1975]), where the defendant was charged with the failure to comply with a violation order issued by the fire department. At trial the People sought to prevent the court from reviewing the validity of the violation order. In rejecting the People’s position, the court, without citing either Namro holding, stated: “In this respect, how can the Fire Commissioner, by the mere issuance of a violation order, be the sole arbiter as to the existence of this predicate in the face of the emphatic denials by defendants? The applicability of the ordinance to the building involved in this prosecution is a matter for judicial determination and not administrative fiat.” (People v Cedar Mgt. Corp., supra, at p 862.) Then, after determining that substantive due process required the People to prove the validity of the underlying violation order as an essential element of the crime, the court acquitted the defendant in the absence of such proof. (See also, People v Austern, 75 Misc 2d 390 [Crim Ct, NY County 1973].)
In People v Spa Xanadu (94 Misc 2d 10 [Crim Ct, NY County 1978]), the court was presented with a prosecution based upon the defendant’s failure to comply with a violation order issued by one City agency, although prevented from doing so by *792 another agency’s denial of a permit necessary for the defendant’s compliance. Despite the People’s urging of the Namro I doctrine upon it, the court found that although Namro I had not been specifically reversed, it was of dubious precedential value because “Its ultimate effect has been diluted to an extent apparently undefined as yet” (People v Spa Xanadu, supra, at p 13). The court, cognizant of the administrative crossfire in which the defendant was placed and aware that adherence to Namro I mandated a conviction, adopted a rather unique resolution to this quandary. The court elected not to follow Namro I. Rather, it found on the peculiar facts before it, a dismissal in the interests of justice was warranted.
Therefore, while lower courts in the later line of cases have engineered methods of avoiding the dubious Namro I holding, these matters have invariably escaped subsequent appellate review. This court notes that mechanisms used, such as acquittals, dismissals and nominal fines, minimize the opportunity for appeal. In short, the appellate courts have had no occasion in the last 20 years to reconsider or reconcile the issues presented by both Namro rulings.
Only in the recent People v Brooklyn Union Gas Co. (No. 83-41, App Term, 2d Dept 1983) has Namro I been cited with approval. That memorandum decision, however, provides no instructive analysis of the issues raised here.
Therefore, the question crucial to the court’s determination of the issues presented is: to what extent is the subsequently diluted principle announced in Namro I controlling? If the Namro I doctrine remains viable the uncontroverted evidence would mandate the defendants’ conviction of the charged crimes. However, if the People are required to prove the validity of the underlying violation order, the record before me, particularly the testimony of Inspector Di Renzo and Commissioner Dennis and the internal documents prepared by the Department of Buildings, would require the court to find that the People have failed to prove the defendants’ guilt beyond a reasonable doubt.
Accordingly, this court is presented purely with a question of law in deciding the instant motions and in rendering a verdict. Therefore, mindful of this determination, the court embarks on the following substantive and procedural course towards the resolution of this matter.
Fundamental to our principles of the republican form of government is the division of its power and function into three branches: the executive, legislative and judicial. Critical to the proper operation of government is the system of checks and *793 balances to insure that one branch does not abuse its power or ignore its duty. These basic principles of American civics apply equally to the government of the City of New York as they do to our Federal Government.
It is therefore incumbent upon this court as a representative of the judicial branch of government to check, indeed review, the executive branch’s (Department , of Buildings) exercise of its authority.
It is a fundamental principle of law that when a defendant is charged with a crime he is entitled to due process of law, regardless of the charges against him. This court cannot apply some lesser standard merely because the crimes charged appear in the Administrative Code, rather than in the Penal Law.
If this court adopted the position suggested by the People, the Criminal Court would be relegated to a rubber stamp or a chief clerk and penalty exchequer for the Department of Buildings. Instead of reviewing the actions of the executive branch of government, this court would merely be providing the Department of Buildings with the service of processing its claims, setting its fines and assisting in the collection of its debts. It is clear to this court that the position so vehemently urged by the People is fundamentally and constitutionally unsound and at complete odds with any concept of due process. As the court in Austern (75 Misc 2d 390, 393, supra) stated: “raising an] act of an administrative officer to a judicial level without a trial * * * would be a complete denial of substantive due process.”
Therefore, I find that the basic constitutional principles of due process of law and the government’s separation of powers require the People to prove the underlying violation as an element of the crime charged before a defendant can be convicted of a misdemeanor in Criminal Court.
Mindful of the Court of Appeals decision in Namro I, I adopt the procedure announced in People v Brown, (40 NY2d 381 [1976]), and subsequently codified in CPL 290.10 (1) (b).[4] This *794 mechanism will insure appellate review of these issues and procedures which will determine the method by which all similar violations of the Administrative Code are prosecuted in the City’s Criminal Courts.
Therefore, the court having previously reserved decision on the defendants’ motions for a trial order of dismissal until a verdict is rendered, finds the defendants guilty of the instant charges pursuant to the doctrine stated in People v Namro Holding Corp. (Namro I) (10 AD2d 702, affd 8 NY2d 1131, supra). However, for the reasons previously stated, the court sets aside this verdict pursuant to CPL 290.10 (1) (b). Accordingly, the defendants’ motion to dismiss is granted.

. CPL 290.10 (1), in pertinent part, provides: “At the conclusion of the people’s case or at the conclusion of all the evidence, the court may * * * issue a ‘trial order of dismissal,’ dismissing any count of an indictment upon the ground that the trial evidence is not legally sufficient to establish the offense charged therein or any lesser included offense.”

. Administrative Code § 643a-12.0, in pertinent part, states:
“The owner, lessee, or occupant of any building in which a violation of the zoning resolution has been committed or shall exist * * * shall be guilty of a misdemeanor * * *
“b. Any such person, having been served with an order to remove any such violation, who shall fail to comply with such order within ten days after such service or who shall continue to violate any provision of the building zone resolution in the respect named in such order, shall be guilty of a misdemeanor.
“c. In addition to the foregoing remedies, the city may maintain an action for an injunction to restrain any violation of such zoning resolution.”

. Administrative Code § C26-87.0, in pertinent part, states: “any person who shall receive and fail to comply with any written peremptory order of the superintendent issued when an immediate compliance with such order is essential to the public peace or safety, within the time specified in such order, in addition to any other punishment prescribed by law shall be punished by a fine of not more than five hundred dollars or by imprisonment not exceeding six months, or by both.”

. CPL 290.10 (1) (b), in pertinent part, provides as follows: “1. At the conclusion of the People’s case or at the conclusion of all the evidence, the court may, except as provided in subdivision two, upon motion of the defendant * * * ' (b) reserve decision on the motion until after the verdict has been rendered and accepted by the court. Where the court has reserved decision and the jury thereafter renders a verdict of guilty, the court shall proceed to determine the motion upon such evidence as it would have been authorized to consider upon the motion had the court not reserved decision. If the court determines that such motion should have been granted upon the ground specified in paragraph (a) herein, it shall enter an order both setting aside the verdict and dismissing any count of the indictment upon such ground. If the jury is discharged before rendition of a verdict the court shall proceed to determine the motion as set *794 forth in this paragraph.”
Clearly, the mechanism detailed in CPL 290.10 (1) (b) is employed to provide the People with an opportunity to appeal dismissals at trial without possible double jeopardy consequences. (United States v Scott, 437 US 82 [1978]; People v Brown, 40 NY2d 381; People v Marin, 102 AD2d 14 [2d Dept 1984].)
Moreover, although CPL 290.10’s application to nonjury trials is indeed rare, appellate courts have determined that the section also authorizes trial orders of dismissal after Bench trials. (People v Sabella, 35 NY2d 158 [1974]; People v Ferreras, 100 AD2d 940 [2d Dept 1984].)